210 N.J. Super. 76 (1986)
509 A.2d 225
ATLANTIC CITY MUNICIPAL UTILITIES AUTHORITY, PLAINTIFF-APPELLANT,
v.
ROBERT E. HUNT, ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted December 18, 1985.
Decided May 2, 1986.
*78 Before Judges KING, O'BRIEN and SIMPSON.
Slap, Williams & Cuker, for appellant (John C. Matthews, of counsel).
Irwin I. Kimmelman, Attorney General of New Jersey, for respondent (James J. Ciancia, Assistant Attorney General, of counsel; Karen L. Suter, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case raises important issues concerning the scope and retroactive application of the Spill Compensation and Control Act of 1976 (Spill Act).[1] The site which commands our attention is Price's Landfill, located near wells which the plaintiff, Atlantic County Municipal Utilities Authority (MUA), operates. *79 This landfill has been designated by the federal Environmental Protection Agency (EPA) as one of our nation's most dangerous hazardous waste sites. This action was brought by the Atlantic County MUA against defendant Hunt in his representative capacity as administrator of the Spill Fund, established by the Act, to recover cleanup and removal costs incurred because of the environmental hazard created at the landfill.
In the Law Division, Judge Perskie granted the Spill Fund's motion for summary judgment. He ruled that the Spill Fund was not available to the plaintiff for costs incurred for cleaning up discharges which took place before the Spill Act was passed and the Spill Fund created. He held that the Act applied to costs of cleanup of pre-Act discharge only if the costs were incurred by the New Jersey Department of Environmental Protection (DEP). He also found that the "discharge" at Price's Landfill, also called Price's Pit, occurred before adoption of the Act in 1976.
On this appeal, plaintiff challenges both conclusions. We agree with the Law Division judge and conclude that the strict liability provision of the Spill Act applies only to the cleanup costs of prospective spills for parties other than DEP and that the discharge here occurred in 1971 and 1972. We therefore affirm.
This is the procedural background. On July 1, 1983 plaintiff filed an amended claim with the Spill Fund seeking reimbursement under the Act, N.J.S.A. 58:10-23.11 et seq. for costs incurred as a result of the discharge of hazardous substances. Defendant denied the claim in July 1983 and suit was filed seeking declaratory relief. Plaintiff sought judgment declaring (1) that the fund was strictly liable, (2) an award of $946,217.15 in damages against the Fund, (3) that defendant acted in bad faith, and (4) attorneys' fees, interest and costs. Defendant Fund asserted immunity under the Tort Claims Act, N.J.S.A. 59:1-1 et seq., and denied responsibility under the Spill Act. On *80 cross-motions for summary judgment, Judge Perskie granted defendant's motion.
This is the factual background. Many of the facts are derived from U.S. District Court Judge Brotman's opinion in United States v. Price, 523 F. Supp. 1055 (D.N.J. 1981), aff'd 688 F.2d 204 (3d Cir.1982). Indeed, plaintiff MUA attached Judge Brotman's factual findings in United States v. Price to its claim form.
Price's Landfill is a 22-acre site located on the border of Pleasantville and Egg Harbor in Atlantic County. The owner, Charles Price, applied in 1970 for a permit to operate a landfill. He did not disclose in the application that he would dispose of solid and liquid chemicals. In 1971, Price began accepting chemical waste. He renewed his application in 1972 and then asked for permission to dispose of chemical waste. His permit was renewed but without permission to accept chemical waste.
Nevertheless, during 1971 and 1972 Price's Landfill accepted nine million gallons of industrial and chemical waste containing such contaminants as arsenic, lead and benzene. These wastes were either poured on the ground or buried in drums. There is, as yet, no evidence that the drums have corroded and released their contents. No chemical waste was dumped after 1972; Price's was closed to commercial waste after 1976.
Plaintiff MUA owns and operates the Atlantic City Water Department supplying over 10,000 commercial and public users. The water system has 15 wells and a reservoir. One of the wells is 3,400 feet east of Price's Landfill.
The Spill Act took effect on April 1, 1977. In 1979, EPA evaluated Price's Landfill for ground water contamination and its effect on the area's wells. EPA concluded that Price's should never have accepted hazardous wastes because of its proximity to water supplies. Some of the chemicals were carcinogenic. EPA determined that the contaminants were moving toward plaintiff's wells and at the current velocity would reach plaintiff's nearest well in a dozen years.
*81 Plaintiff learned about this in December 1980 when the federal government filed United States v. Price. The United States sued the owner and former owner of Price's Landfill as well as a number of the source companies for the chemicals which were dumped there, alleging that they were liable under 42 U.S.C.A. § 300i and 42 U.S.C.A. § 6973. Plaintiff intervened in the suit in January 1981.
Plaintiff shut down four wells located in the area of Price's Landfill in March 1981. It also met with EPA and DEP to decide what to do. It decided to allow Paulus, Sokolowski and Sartor, an engineering consulting firm, to study the contamination problem and to make recommendations. Defendant denied that he approved this study which cost $356,816.
In the fall of 1981, plaintiff installed granular activated carbon filters in the main water filter plant to prevent the transmission of hazardous waste. According to plaintiff, DEP and EPA approved the installation of these filters. Defendant denied that he approved the installation of these filters which cost "in excess of" $256,000. Also in the fall of 1981, plaintiff hired Weston Associates to design a replacement well field. Plaintiff again claimed that EPA and DEP approved the Weston study. Again, defendant denied that he approved the study. Plaintiff paid $214,000 to Weston Associates for that study.
On September 23, 1981 Judge Brotman issued a written opinion in United States v. Price in which he denied the United States' motion for a preliminary injunction which would have required the then-owner of Price's Landfill to fund a study to determine the extent of the problem and to provide an alternate water supply. Plaintiff filed its first claim with the Spill Fund on either September 8 or October 18, 1982. It alleged that the discharge occurred in "May 1971 and [was] continuing to the present." The claim also stated that plaintiff had filed a separate civil suit against the defendants in United States v. Price. Plaintiff sought $466,000 allocated as follows: $356,000 *82 for the Paulus, Sokolowski and Sartor study, $10,000 for legal fees and $100,000 for the filters. In response to the question of whether plaintiff had received any compensation for the cleanup costs claimed in the application, plaintiff answered "Yes. Through a Superfund (CERCLA) agreement certain monies are forthcoming, however, none of these monies cover the work that is being claimed in this application." Defendant's countering affidavit stated that he advised plaintiff's executive director that plaintiff MUA's claim could not be paid under the Act. His reason for denying the claim was that the "Act did not authorize payment of third-party claims for damages incurred as a result of discharges which occurred prior to April 1, 1977." On October 19, 1982 the Third Circuit affirmed the district court's decision in United States v. Price. 688 F.2d at 204.
Plaintiff filed an amended damage claim on July 5, 1983. It sought $946,217: allocated $356,000 for the Paulus, Sokolowski and Sartor study; $255,901 for the filters, $214,000 for the Weston study and $119,000 for the staff time and legal fees. Defendant again orally advised plaintiff's executive director that plaintiff's claim was not eligible for payment. He also told plaintiff's executive director "that the only way this `claim' might be paid from Spill Fund monies would be if the New Jersey Department of Environmental Protection requested an authorization of funds for a pre-Act cleanup and certified the expenditures by ACMUA [plaintiff] as a cleanup and removal contractor." "Sometime after" that conversation DEP submitted a voucher for the Weston study, which defendant paid using money from the fund.
Defendant's stated motivation for denying both claims was that it was "part of my duty as Spill Fund Administrator to determine whether a discharge is pre or post-Act." According to his consistent interpretation of the Act, only DEP could be paid for cleanup and removal costs incurred as a result of a discharge which occurred before the Act was passed. Moreover, even if DEP submitted vouchers, he contended that his decision to pay for pre-Act discharges was discretionary.
*83 In his oral opinion, Judge Perskie decided that N.J.S.A. 58:10-23.11g(a), providing that the fund "shall" be strictly liable for all cleanup and removal costs and for all damages, was intended to be prospective "by its design, if not by its language." He found that amendments to the statute in 1979, discussed below, "were specifically designed to give to the Department [DEP] and, ... the Department only, access to this fund for the purpose of addressing pre-Act discharges."
The judge had already determined that at Price's Landfill "before and after the enactment of the statute, those wastes have leaked or leached into the land." Based on his interpretation of the word "discharge" to mean "placement," he decided that the discharge at Price's Landfill "occurred when the dumping occurred... rather than when it started leaking, or when it leaks into the aquifer." Though Judge Perskie did not explicitly so state, it is implicit in his opinion that he found that the hazardous waste were discharged before 1977, since Price's Landfill did not accept chemical waste after 1972.

I
N.J.S.A. 58:10-23.11g(a) states: "The fund shall be strictly liable, without regard to fault, for all cleanup and removal costs and for all direct and indirect damages no matter by whom sustained ..." resulting from the discharge of a hazardous substance. Plaintiff contends that the judge erred by concluding that this section was prospective except as to DEP's claims for cleanup and removal costs for discharge occurring prior to the effective date of the Act.
Plaintiff filed a declaratory judgment action against defendant after its claim was denied. R. 2:2-3(a)(2) permits an appeal to this court to be filed "to review final decisions or actions of any state administrative agency or officer." The denial of plaintiff's claim was a final agency action. See Jos. L. Muscarelle, Inc. v. State, by Transp. Dept., 175 N.J. Super. 384, 393 (App.Div.), certif. granted 85 N.J. 484 (1980), app. dism. *84 87 N.J. 321 (1981). Because it was unnecessary for plaintiff to file this declaratory judgment action to obtain review of defendant's decision, in a sense, plaintiff's appeal is untimely because defendant denied plaintiff's claim in July 1983 and plaintiff's notice of appeal was filed in February 1985.
However, we will not dismiss plaintiff's appeal. R. 1:13-4(a) allows a court to transfer a matter over which it does not have jurisdiction to a court or agency which does have jurisdiction. R. 1:13-4(b) states: "If any action transferrable under paragraph (a) because of lack of jurisdiction over the subject matter is appealed without having been transferred, the appellate court may decide the appeal and direct the appropriate judgment or decision to be entered in the court or agency to which the action should have been transferred." Thus, we have the power to decide plaintiff's appeal.
The Legislature passed the Act to
... exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharge. [N.J.S.A. 58:10-23.11a].
The Act prohibits the discharge of hazardous substances, N.J.S.A. 58:10-23.11c, and defines the terms "hazardous substances" and "discharge" in N.J.S.A. 58:10-23.11b(h) and (k).
The Spill Compensation and Control Act was passed to control the transfer and storage of hazardous substances, to establish liability for damage sustained from the discharge of hazardous substances, to provide responsibility for containment and removal and to provide compensation for businesses and persons damaged by such discharge. N.J.S.A. 58:10-23.11a. The administrator of the Fund established by the Act is responsible for money collected from a tax on the physical transfer of petroleum and other hazardous substances. N.J.S.A. 58:10-23.11h. [Tree Realty, Inc. v. Department of Treasury, 205 N.J. Super. 346, 347-348 (App.Div. 1985)].
The Legislature created the fund to carry out the purposes of the Act. N.J.S.A. 58:10-23.11i. Until this year, the state treasurer was authorized to appoint the Spill Fund administrator, the defendant in this case. N.J.S.A. 58:10-23.11j(a), amended *85 by L. 1985, c. 115. Now, the Commissioner of DEP appoints the administrator. L. 1985, c. 115, § 4. Defendant has the power to "represent the State in meetings with the alleged discharger and claimants", "determine if boards of arbitration are needed to settle particular claims", "administer boards of arbitration", and "certify the amount of claims and names of claimants...." N.J.S.A. 58:10-23.11j(a)(1)-(4).
When a hazardous substance is discharged, DEP may either remove the discharge or order the discharger to remove it. N.J.S.A. 58:10-23.11f(a). DEP may draw on the fund in order to pay for removing the discharge. Ibid. "[S]ubject to the approval of the administrator [defendant] with regard to the availability of funds," DEP may remove or arrange for the removal of any hazardous substance which "[h]as been discharged prior to the effective date of" the Act. N.J.S.A. 58:10-23.11f(b)(3). Until September 6, 1984 in order for DEP to do so, the discharge had to be one which "poses a substantial risk of imminent damage to the public health or safety or imminent and severe damage to the environment." Ibid., amended by L. 1984, c. 142, § 2. Defendant can only approve payments for DEP's cleanup and removal costs "to the extent that" defendant "determines that adequate funds from another source are not or will not be available." N.J.S.A. 58:10-23.11f(d). There is also an $18,000,000 yearly cap on payments for all pre-Act discharges and a $3,000,000 cap on payment for any one pre-Act discharge or related set or series of discharges. N.J.S.A. 58:10-23.11f(d).
In addition to allowing DEP to receive money from the fund, the Act allows other parties to receive compensation for various damages they sustain as a result of the discharge of a hazardous substance. This is the strict liability provision, N.J.S.A. 58:10-23.11g(a), upon which plaintiff bases its claim. Cleanup and removal costs are defined as "all costs associated with a discharge incurred by the State or its political subdivisions or their agents or any person with written approval from" DEP. Such costs can be incurred either in the removal of the substances *86 or the "taking of reasonable measures to prevent or mitigate damages." N.J.S.A. 58:10-23.11b(d). The elements of a damage claim are listed in N.J.S.A. 58:10-23.11g(a)(1)-(5).
When the fund pays a claimant, it "acquir[es] by subrogation all rights of the claimant to recovery of such costs or damages from the discharger or other responsible party." N.J.S.A. 58:10-23.11q. The fund may recover over against "[a]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department [DEP] has removed or is removing pursuant to subsection b. of section 7...." N.J.S.A. 58:10-23.11g(c). (Subsection b. is the section giving DEP the power to remove pre-Act discharges.)
The fund may file suit in Superior Court for reimbursement if the discharger or responsible party does not voluntarily reimburse it. N.J.S.A. 58:10-23.11q. The fund may recover no more than $50,000,000 from the responsible party unless certain exceptions apply, N.J.S.A. 58:10-23.11g(b), but need "prove only that an unlawful discharge occurred which was the responsibility of the discharger or other responsible party." N.J.S.A. 58:10-23.11q. The only defenses to this section which an owner or operator may raise are "an act or omission caused solely by war, sabotage, or God." N.J.S.A. 58:10-23.11g(d). N.J.S.A. 58:10-23.11o provides that defendant shall disburse funds first for "[c]osts incurred under section 7 [N.J.S.A. 58:10-23.11f] of this Act" and then for "[d]amages as defined in section 8 [N.J.S.A. 58:10-23.11g] of this Act."
The issue before us is whether the fund is liable to plaintiff for its damages resulting from a pre-Act discharge, or whether it is liable only for costs incurred by DEP to clean up a pre-Act discharge. In Gibbons v. Gibbons, 86 N.J. 515, 521 (1981), the Supreme Court stated that "[t]he courts of this State have long followed a general rule of statutory construction that favors prospective application of statute" and then listed three exceptions to this rule. The first is where the Legislature has expressed an intent to apply the statute retroactively either in *87 the legislative history or by implication where retroactivity is "necessary to make the statute workable or to give it the most sensible interpretation." Id. at 522. The second is where the "statute is ameliorative or curative." Id. at 523. The third is where certain "considerations [such] as the expectations of the parties warrant retroactive application." Ibid. The Court concluded that even if a statute could be applied retroactively, a court should inquire as to whether retroactive application will "result in `manifest injustice' to a party adversely affected by such an application of the statute." Ibid.
There is a constitutional limit on the retroactive application of statutes. In Rothman v. Rothman, 65 N.J. 219, 225 (1974), the Supreme Court stated that retroactive application is constitutional as long as "the public interest to be promoted sufficiently outweighs in importance the private right which is impaired." In State, Dept. of Envir. Prot. v. Arlington Whse., 203 N.J. Super. 9, 14 (App.Div. 1985), we stated that "a remedial or procedural statute may be given retrospective effect without infringement of vested rights, provided that the new statutory remedy is for redress of a pre-existing actionable wrong."
When the Act was passed it did not contain any references to discharges occurring before its effective date. None of the sponsors or speakers mentioned the problem of pre-Act discharges at the legislative hearings. Public Hearings on S-1409 and A-1903, The Spill Compensation and Control Act Before the Senate Committee on Energy and Environment and the Assembly Committee on Agriculture and Environment, 197th Session of the New Jersey Legislature (1976). In 1979 the Legislature amended the Act to add: (1) the section allowing DEP to apply to the fund for the cost of cleaning up pre-Act discharges (N.J.S.A. 58:10-23.11f(b)(3)), with the requirement (since deleted) that the discharge poses an imminent threat; (2) the cap on spending for pre-Act discharges, which was lower than is presently provided (N.J.S.A. 58:10-23.11f(d)); and (3) a provision for imposition of strict liability on a person *88 who is "in any way responsible for a discharge which the department is removing pursuant to subsection b." N.J.S.A. 58:10-23.11g(c). In contrast to the initial hearings on the Act, retroactivity was of great concern to the Legislature in 1979. Public Hearing on A-3542, Amendment to the Spill Compensation and Control Act, Assembly Agriculture and Environment Committee, 198th Session of New Jersey Legislature (1979). Both plaintiff and defendant rely on the comments made during the hearings to support their positions on retroactivity versus prospectivity. See Sutherland, Stat. Const. (4th ed.), § 48.06 at 308, § 48.10 at 318; Highton v. Musto, 186 N.J. Super. 281, 294 (Law Div. 1982).
When the hearing was opened, the aide to the committee, Norman Miller, stated that the amendments permitted "DEP to apply the fund to the clean-up and removal of ... ancient spills." Id. at 1. The term "ancient spills" was used as a synonym for pre-Act discharges. Assemblyman Raymond Lesniak, the sponsor of the amendments, was the first witness and began by discussing the finances of the fund. Id. at 3. He stated that there were claims for retroactive chemical spills of $8.9 million. Id. at 4. Chairman Stewart asked if there was a debate about whether these claims could be paid by the fund. Lesniak answered
That is correct. The Ventron Case only applies to that situation, itself, and I assume that case will be on appeal anyway. So it would still be debatable whether, in fact, the fund could be used to support these claims. But these are claims that have been identified and made against the fund. Retroactive petroleum spills that the fund has identified, the claims for them are $1.2 million. A total of the retroactive cases as of September 30th is approximately $10 million. There are damage claims also. These are not for the cleanup, but these are for damage done by the spills. They are not extremely significant  they amount to hundreds of thousands of dollars  when we are talking in terms of these millions. Chemical spills, $300,000; oil spills, around $100,000. These are for damages done by the spills. They do not involve the retroactivity issue and I assume that they will be paid by the fund. [Ibid.].
Later on in the testimony, Mr. Lesniak stated that he was "willing to accommodate any types of adjustments in this area that may be necessary in order to give the department greater *89 leeway to handle the retroactive type claims. The reason why there is a lid in there is to avoid the complete bankruptcy of the fund due to a discovery that may make it unable to handle subsequent problems and be just concerned with one problem." Id. at 13. Finally, in response to an industry spokesman, Lesniak said, "one point I do want to make and alert you to is that under the current state of the law, as I read the Ventron case, the fund is open-ended or could be open-ended as far as retroactive spills." Id. at p. 21.
In State, Dept. of Environ. Protect. v. Ventron Corp., 94 N.J. 473 (1983), the DEP sued, among other defendants, a corporation and its wholly-owned subsidiary for dumping mercury which seeped into a tidal estuary known as Berry's Creek. In 1979, before the date of these hearings, the trial judge issued an unpublished opinion concluding that while the Spill Act liability provisions did not apply retroactively, monies from the Fund should be made available. Id. at 482. (This conclusion was reversed by this court, see 182 N.J. Super. 210, 228 (App.Div. 1981), which decision was affirmed on this point by the Supreme Court). Thus, there was no opinion by the Supreme Court in the Ventron case at the time these hearings were held.
Plaintiff's argument begins with three assumptions. The first is that the Legislature intended the strict liability of the Act to be completely retroactive when they passed the statute. Second, plaintiff assumes that the Legislature intended to separate DEP's ability to recover for cleanup and removal costs and damages. This is allegedly shown by the separation of these two items in N.J.S.A. 58:10-23.11o. Third, plaintiff assumes that in 1979, in response to the Ventron decision, the Legislature amended the statute to limit only DEP's ability to recover for cleanup costs, not the ability of third parties. Therefore, according to plaintiff, the Legislature always intended to allow third parties to recover for their damage claims and cleanup costs.
*90 In our opinion, all of plaintiff's assumptions are quite questionable. First, its assumption that the Act's strict liability provision was intended to be retroactive is contrary to the general presumption of prospectivity found in Gibbons, 86 N.J. at 515, and there is no indication in the Act's history that the Legislature was originally thinking of generally covering discharges which occurred before the existence of the Act.
Second, plaintiff's assumption that DEP's cleanup and removal costs and third parties' cleanup and removal costs and damage claims were intended to be separate cannot be sustained under the structure of the Act. This conclusion is supported by the distinction drawn between N.J.S.A. 58:10-23.11f and N.J.S.A. 58:10-23.11g in N.J.S.A. 58:10-23.11o. That is, N.J.S.A. 58:10-23.11o says that defendant should pay "costs incurred" under N.J.S.A. 58:10-23.11f and then "damages as defined in" N.J.S.A. 58:10-23.11g. But, if the Legislature intended to separate these claims, the Legislature would not have amended N.J.S.A. 58:10-23.11f, which discussed DEP's right to recover its cleanup costs, to allow private residential well owners to recover for the contamination of these wells; it would have put this amendment in N.J.S.A. 58:10-23.11g which discusses the claims of third parties. Moreover, the language in N.J.S.A. 58:10-23.11g "no matter by whom sustained" is broad enough to include DEP's claims. In order to maintain a separation between these two sections, the phrase "cleanup and removal" and the phrase "no matter by whom sustained" contained in N.J.S.A. 58:10-23.11g have to be read out of that section. That section makes the fund liable for all cleanup costs and damages no matter by whom sustained. We think it more sensible to regard the distinction drawn between N.J.S.A. 58:10-23.11f and N.J.S.A. 58:10-23.11g in N.J.S.A. 58:10-23.11o as the Legislature's method of setting priorities for payments from the fund.
Finally, plaintiff's third assumption, that the Legislature wanted to set limits on DEP's ability to collect for its cleanup costs but not on the ability of third parties to so collect, is not *91 logical. Presumably, DEP acts in all of the taxpayers' interests when it cleans up a site. A third party usually is serving primarily its own interest when it acts.
We conclude that Judge Perskie was correct in ruling that the strict liability provision of N.J.S.A. 58:10-23.11g(a) was prospective except with regard to DEP's ability to recover for its cleanup and removal costs incurred in removing hazardous substances discharged before the passage of the Act. When the New Jersey Legislature initially considered the Act, there were no similar federal statutes on the books. Passage of the Act was innovative. It makes more sense that when a statute is innovative, a legislature takes a cautious and narrow approach rather than an all-inclusive approach. As the Legislature surely realized, the problems of hazardous waste and the cost of cleaning it up are staggering. Therefore, a "one-step-at-a-time" approach to retroactivity makes more sense to us.
Moreover, the high cost of cleaning up toxic waste would make it unlikely that the Legislature would open the fund to claims which could conceivably cause bankruptcy. This concern is expressed in Assemblyman Lesniak's statement that a lid on the payment of cleanup costs resulting from pre-Act discharges was appropriate. Finally, while the Legislature clearly intended to remedy the plight of those injured by the discharge of hazardous substances by giving them a swift means of redress, the Committee was also concerned with giving DEP broad authority to tackle the problem of hazardous waste. Therefore, we do not think that the "ameliorative" test cited by the Gibbons Court, 86 N.J. at 523, as a factor in determining if a statute be applied retroactively is pertinent. Nor is the "expectations of the parties test" ibid., pertinent; at the time of discharge in 1971-1972, the actors could not have conceived of a "spill fund."
We think the legislative history is far from definitive since the question of whose claims Assemblyman Lesniak was talking about was never specified. We think that the comments *92 made by him could be taken in two ways, but both support the interpretation that the fund should be used retroactively only for DEP's cleanup costs. The first is that the Legislature initially intended the strict liability provision to be prospective only. It then decided to give DEP the power to clean up pre-Act discharges and simultaneously allowed it to recover from the fund. This interpretation is supported by the aide's comment at the beginning of the hearing, and by the simultaneous amendment of N.J.S.A. 58:10-23.11g(c) to impose strict liability on those who have discharged a hazardous substance or who are responsible for the discharge of a hazardous substance if the department was using its power under N.J.S.A. 58:10-23.11f to clean up the discharge. It is also supported by a statement made by Mr. Lesniak in a law review article that: "[t]he Act is essentially prospective in its application." Lesniak, "The Statutory Treatment of Wastes: A Legislator's Perspective," 7 Seton Hall Legis.J. 35, 38 (1983). Therefore, we think the Legislature simultaneously expanded DEP's powers and provided the fund with a source to pay for DEP's added claims. The second interpretation is that the Legislature had no clear intent one way or the other regarding retroactivity and in order to negate the trial judge's decision in Ventron, it amended the statute to provide that only DEP could recover for cleanup claims.
Despite our conclusion that based on the extant history the Legislature intended to allow retroactivity only for DEP's claims and not those of third-parties, we must also examine Ventron, 94 N.J. 473, on which plaintiff relies. There, as we have already noted, DEP sued a corporation, a totally-owned subsidiary, and a corporation into which the subsidiary was merged, for their actions in processing mercury which resulted in the contamination of Berry's Creek.
In addition to deciding that the Act was not retroactive but that the fund could be used for paying for the cost of cleaning up the creek, the trial judge imposed joint liability on two defendants and several liability on two others. Id. at 482. The *93 Appellate Division retroactively applied the amendment of N.J.S.A. 58:10-23.11g to impose liability under the Act on the three defendants still in business. Id. at 483. It imposed joint liability as well as several liability on two defendants. It also ruled that the fund could not be used to pay for cleanup if other funds were available.
The Supreme Court considered whether the amendment to N.J.S.A. 58:10-23.11g(c) imposing strict liability on any person "who has discharged a hazardous substance or is in any way responsible" should be applied retroactively. Id. at 498. It noted that as a result of the 1979 amendment, the fund applied retroactively if the discharge posed a risk of imminent damage to public health or safety or to the environment. Id. at 497, quoting N.J.S.A. 58:10-23.11f(b)(3). The Court concluded that "the Legislature has expressly declared that the Spill Act should be given retroactive effect." Id. at 498. It found that since those who engaged in abnormally dangerous activities were always subject to strict liability, the Act did not create liability, but established a new remedy for a pre-existing wrong. Id. at 499. Earlier, the Court had concluded that the Appellate Division had correctly found a substantial and imminent threat to the environment. Id. at 498. Therefore, it found all of the corporate entities liable under the Act. Ibid.
Plaintiff relies on the Court's statement that the Legislature expressly intended the Act to be given retroactive effect to support its conclusion that N.J.S.A. 58:10-23.11g(a) should be given retroactive effect. Taken out of context, the Court's statement supports this position. It is important, however, to consider the context. The Court was not discussing the provision holding the fund strictly liable; it did not mention this subject once in its opinion. In fact, the Court did not consider the Appellate Division's conclusion that the fund could not be used to pay for the cleanup costs of Berry's Creek. It was directly reviewing the Appellate Division's conclusion that the amendment creating strict liability for those who discharged or were responsible for a pre-Act discharge should be applied *94 retroactively. The Court's conclusion that this provision should be given retroactive effect is sensible in view of the reference in N.J.S.A. 58:10-23.11g(c) to pre-Act discharges through its incorporation of N.J.S.A. 58:10-23.11f(b). We do not think that the Court suggested that all provisions of the Act should be given retroactive effect.
It is not inconsistent per se to hold that one section of an enactment is retroactive and the other is prospective. In McMullen v. Conforti & Eisele, 67 N.J. 416, 418 (1975), the Court decided that the contingent fee rule, R. 1:21-7(c), was intended to be retroactive. But in Kingman v. Finnerty, 198 N.J. Super. 14, 18-19 (App.Div. 1985), the Appellate Division concluded that an amendment to R. 1:21-7(c) increasing the amount of a contingent fee which an attorney was permitted to collect should be applied prospectively only. The purpose of applying the rule retroactively originally was to enable the client to pay a lower fee; applying the amendment to the rule prospectively served the same purpose. Analogously, here the provision imposing liability on a broad category of risks increases the sources of revenue available to the fund. Limiting the strict liability provision prospectively likewise serves to protect the revenues generated.
Two other cases not cited by plaintiff, held that portions of the Act were retrospective. But since neither of them concerned N.J.S.A. 58:10-23.11g(a), they are not necessarily persuasive. The first is Kessler v. Tarrats, 194 N.J. Super. 136 (App.Div. 1984), where the Appellate Division concluded that a provision allowing defendant to have a first lien on property was retroactive. The court first cited to the statement in Ventron declaring that the Act should be given retroactive effect. Id. at 142. But then it said that "[t]he specific holding in Ventron did not address all aspects of the Spill Act, but we find the analysis used in finding the strict liability provision retroactive to be equally applicable to the lien provision." Id. at 142-143. This statement supports our conclusion that the Court's statement in Ventron about retroactivity should not be *95 read too literally and that if its analysis is not applicable to a particular provision of the Act, it should not be followed.
Finally, in State, Dept. of Envir. Prot. v. Arlington Whse., 203 N.J. Super. 9 (App.Div. 1985), DEP brought an action against a number of defendants for costs it incurred in cleaning up chemical products discharged as a result of a fire. The trial judge ruled that the amendment to N.J.S.A. 58:10-23.11g(c) imposed liability upon persons other than dischargers of hazardous substances only for the costs of cleanup and removal of discharges occurring prior to May 1, 1977, the effective date of the Spill Act. Id. at 13. The Appellate Division rejected this reading of the statute, finding that persons otherwise responsible for the discharge of a hazardous substance were responsible for cleanup and removal costs for discharges which occurred after the Act as well. Ibid. It then found that it was not unconstitutional to apply this amendment retroactively since it was "remedial, only providing a remedy as an alternative to common law damages, that is, liability for the costs of DEP cleanup and removal, against persons responsible for hazardous substances" which have been discharged. Id. at 13.
In sum, we think the judge was correct in finding that N.J.S.A. 58:10-23.11g(a) should be applied prospectively and excludes recovery by third parties for cleanup and removal costs as well as for damage claims resulting from the discharge of hazardous substances which occurred before the Act became effective. We think that the legislative history sufficiently indicates an intent to permit only DEP to receive payment from the fund for the cost of cleanup and removal of discharges which occurred before the Act became effective. We also think that the Supreme Court's retrospectivity statement in Ventron does not apply to N.J.S.A. 58:10-23.11g(a).

II
Plaintiff also asserts that the discharge of hazardous substances at Price's Landfill in fact constitutes a "post-Act" *96 discharge for purposes of the Spill Act. Plaintiff so contends because the contaminants continue to leak or leach into the surrounding area, even though they were dumped there well before April 1, 1977, the effective date of the Spill Act. Thus, plaintiff asserts that its damage claim is compensable under section 11g(a) even if the statute is given prospective application only.
The Spill Act now defines a discharge as
... any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substance into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State, when damage may result to the lands, waters or natural resources within the jurisdiction of the State. [N.J.S.A. 58:10-23.11b(h)].
The original definition was amended to delete the requirement that a discharge must threaten the waters of the State. L. 1984, c. 142, § 1.
We conclude that the Legislature intended "discharge" to mean a release into the air, water or land of a hazardous or toxic substance. The pouring of hazardous waste on the ground was a discharge. The placement of the waste stored in containers was not a discharge because there was and has been no interaction with the environment.
Plaintiff here contends that continuing contamination over the years by leaching constitutes a discharge. We disagree with this. Defendant disagrees with the judge's conclusion that a discharge occurred when drums containing hazardous substances were placed at the site. We accept defendant's interpretation on this score. Service Armament Co. v. Hyland, 70 N.J. 550, 561 (1976). Since the drums have not started leaking, no "discharge" has occurred.
When the Act was debated and passed, the Legislature apparently did not discuss what it meant by use of the word "discharge." But in 1979, when the Legislature amended the Act to give DEP the power to remove substances discharged before the Act was passed, it also gave DEP the power to *97 remove hazardous substances in other circumstances. These circumstances included, when, although there had not yet been a discharge from a vessel, there was an imminent danger of discharge, N.J.S.A. 58:10-23.11f(b)(1), and when, although there had not yet been a discharge, DEP determined that substances were not satisfactorily stored or contained and possessed one or more of a specified set of characteristics. N.J.S.A. 58:10-23.11f(b)(2).
Miller, the Committee's aide, noted that the amendments would allow DEP to clean up "imminent spills, when the nature of these materials is such that they are either highly flammable, highly explosive, radioactive or otherwise pose an imminent peril to public health and safety." Hearing on A-3542, supra at 1. Mr. Lesniak also stated that the amendment would "fill in the gap by allowing the spill fund to be used to clean up dangerously stored hazardous chemicals." Id. at p. 3. As defendant asserts, this history indicates that mere placement alone was not intended as a discharge. If stored drums which have merely been placed at a site constituted a discharge, the Legislature would not have felt compelled to amend the statute to allow DEP to take care of them.
In 1981, N.J.S.A. 58:10-23.11f was further amended to allow defendant to make "payments for the restoration or replacement of, or connection to an alternative water supply for, any private residential well destroyed, contaminated, or impaired as a result of a discharge prior to the effective date" of the Act. N.J.S.A. 58:10-23.11f(e). The Senate statement to this bill provided that "this bill would permit property owners whose drinking water supply has been contaminated by a discharge of a hazardous substance to make a claim against the Spill Compensation Fund for restoration and replacement of that water supply source", even if the discharge occurred before the Act was passed. Statement to Assembly Bill 2040.
This statement supports defendant's interpretation that if a discharge occurred before the original Act, the effects of that *98 discharge are not covered. Otherwise, it would not have been necessary to amend the statute to allow property owners to recover in this circumstance. It also supports defendant's interpretation that continuing contamination from an old spill is not a present discharge.
Finally, plaintiff relies on federal statutes and one federal case. First, it brings to our attention CERCLA (the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.A. § 9601 et seq.). One section provides that "[i]n the case of an injury to, destruction of, or loss of natural resources ... [t]here shall be no recovery ... [against certain people or entities] where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before" the enactment of this Act. 42 U.S.C.A. § 9607(f). This Act defines release as "any spilling, leaking, pumping, pouring ... and leaching." 42 U.S.C.A. § 9601(22). Defendant contends that under this section a pre-Act discharge is one where all the damage occurred before the Act was passed, and a post-Act discharge is one in which some damage occurred before the Act was passed and some did not.
Under these sections, it seems that plaintiff's argument may have some merit under CERCLA since the damage did not result wholly before the Act was passed. But this does not mean that the same is true under the Spill Act. Our Act was not modeled after CERCLA since it was passed four years before CERCLA. Also, CERCLA is one federal statute out of a number of federal statutes which cover different environmental problems. Our Act is in this sense more of an all-purpose act. Finally, just because leaching is defined as a release does not mean necessarily that it is a discharge.
Plaintiff also cites Price, 523 F. Supp. at 1055, and a section of the Resource Conservation and Recovery Act, 42 U.S.C.A. § 6973. The section in part provides that if the disposal of solid waste poses an imminent threat, the administrator of EPA may sue for an injunction. Disposal is defined to include a "discharge". *99 42 U.S.C.A. § 6903(3). In Price, the district court judge rejected one defendant's argument that § 7003 was retroactive. 523 F. Supp. at 1070-71. He found that "[t]he gravamen of a section 7003 action ... is not defendants' dumping practices ... but the present imminent hazard posed by the continuing disposal (i.e., leaking) of contaminants into the groundwater." Id. at 1071. Thus, he concluded that § 7003 was not being applied retroactively. Ibid. Plaintiff contends from this that our Act is also prospective and that since leaking is disposal, it is also a discharge.
We do not find plaintiff's reliance on Price and the Resource Conservation Recovery Act persuasive. The federal statute defines disposal to include the word discharge and is broader than the definition of discharge contained in N.J.S.A. 58:10-23.11b(h). Second, there is no indication that our Legislature relied on the Resource Conservation and Recovery Act when it passed our Act.
Plaintiff also raises as a policy argument that the Spill Act was designed to aid those damaged by the discharge of a hazardous substance. According to plaintiff, "the purpose behind subsection (g) and the Act as a whole would be undercut by the drawing of an arbitrary distinction in subsection (g) between continuously harmful discharges which happened to commence before the date of the Act and those which commenced after that date." We think this argument is without merit. Legislatures have to draw lines when passing socially remedial legislation or nothing would get done. As already discussed, for financial reasons the Legislature could not include all prior discharges of hazardous substances. The fund created by the Act is finite, and the effects of hazardous discharges, while not infinite, are prolonged and unpredictable in nature.
We think that Judge Perskie was correct in concluding that the Legislature did not intend either that contamination be considered a discharge or that, if a discharge occurred before *100 the Act but the effects continued after, the effects were covered under the Act for all purposes. We also conclude that a discharge is some action resulting in an environmental effect caused by an interaction with the environment. Contamination is not such an action but it is the result.
We do agree with defendant, however, that the judge's conclusion that a discharge occurred when drums were placed on the site was erroneous. If this were so, the Legislature would not have needed to amend N.J.S.A. 58:10-23.11f(b) to allow DEP to remove hazardous substances which were improperly stored. Even though the judge's definition of discharge was too broad, he was correct in concluding that the discharge here undoubtedly occurred before April 1, 1977, the effective date of the Act. The evidence indicated that hazardous substances were discharged in 1971 and 1972 when toxic substances were poured onto the ground at Price's Landfill. As noted, there is as yet no evidence that the contents of the drums have leaked.
The agency action is affirmed.
NOTES
[1] N.J.S.A. 58:10-23.11 et seq., L. 1976, c. 141, e.d. April 1, 1977. The United States Supreme Court recently found the Act partially pre-empted by the so-called "Superfund Act", 42 U.S.C.A. § 9601 et seq., in Exxon Corp. v. Hunt, ___ U.S. ___, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986).