210 N.J. Super. 407 (1986)
510 A.2d 62
TOWNSHIP OF SOUTH ORANGE VILLAGE, PLAINTIFF-APPELLANT,
v.
ROBERT E. HUNT, ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND; KENNETH R. BIEDERMAN, STATE TREASURER OF THE STATE OF NEW JERSEY; STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 5, 1986.
Decided May 19, 1986.
*410 Before Judges FRITZ, BRODY and BAIME.
Edward Weisslitz argued the cause for appellant (Schechner & Targan, attorneys; Edward Weisslitz, on the brief).
Karen L. Suter, Deputy Attorney General, argued the cause for respondents (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Karen L. Suter, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This is an appeal from the final determination of the New Jersey Spill Compensation Fund denying the Township of South Orange Village's claims for damages arising from the contamination of its water supply as a result of the discharge of gasoline caused by leaking underground storage tanks. The Fund decided that the Township's claims were facially ineligible because they were not timely filed under N.J.S.A. 58:10-23.11k[1] and because the damages were caused by discharges *411 which occurred prior to April 1, 1977, the effective date of the Spill Compensation and Control Act, (N.J.S.A. 58:10-23.11 et seq.).
The tortured procedural history is inextricably interwoven with the facts underlying the Township's initial and amended claims. On February 14, 1977, Township officials discovered a leaking underground gasoline tank located at a Gulf service station in the business district of the municipality. Although much of the gasoline was ultimately recovered, the owner of the service station estimated that approximately 6,000 gallons had been lost. On March 12, 1977, the odor of gasoline was detected in the Township's number 8 water well located in Walton field which was approximately 1500 feet southwest of the Gulf service station. This well was immediately removed from service and pumped in an unsuccessful effort to remove the contamination.
Shortly thereafter, the Township's number 5 well, located several hundred feet further south, began to emit gasoline odors. On April 4, 1977, two other wells in the near vicinity disclosed gasoline contamination. Within the week, Township officials detected the strong odor of gasoline emanating from additional wells. Eventually, eight of the Township's wells were contaminated and the entire field was removed from operation on April 18, 1977.
The initial gasoline spill was investigated by Township officials, the Gulf Oil Corporation and the Department of Environmental Protection (DEP). In the course of this investigation, it was discovered that storage tanks at several other service stations had leaked substantial quantities of gasoline. Although several of these discharges clearly occurred prior to the effective date of the Act, others were discovered in June 1977 *412 and thereafter. Because of these discharges, the Township found it necessary to purchase water from outside sources.
The Township submitted its initial claim for damages to the Fund on January 11, 1978. The claim form prepared by the Township was somewhat ambiguous with respect to when the discharge was alleged to have occurred. While the Township represented that the "first indication" of the discharge was on March 12, 1977, the Township Mayor emphasized in an accompanying letter that the investigation was ongoing and that the claim form was being submitted merely to satisfy the one year deadline set forth in N.J.S.A. 58:10-23.11k. In addition, the Township attached an exhibit to the claim in which it indicated that it had been advised by the DEP's Oil Spill Response Unit of additional discharges emanating from other facilities.
An amended claim was filed on February 26, 1979. In that claim form, the Township represented that the discharge had taken place "on or about March 12, 1977." Attached to the claim form was the exhibit described previously which indicated that the investigation of the Oil Spill Response Unit had revealed discharges from other facilities. The amount of the damages claimed was increased from $436,000, as initially requested, to $1,068,787.
On September 4, 1979, the Spill Fund Administrator denied the Township's original and amended claim. In his letter to the Township, the Administrator wrote that "[t]he Fund has taken a position that it is not obligated to pay claims where the discharge commenced prior to April 1, 1977." However, the Fund's denial of the Township's claims was not wholly unequivocal. The Administrator emphasized that "the retroactivity question is presently in litigation and we will maintain your claim on file for further evaluation following the court decision."
On February 29, 1980, the Township filed a second amended claim seeking compensation in the amount of $2,606,372. In that claim form, the Township repeated its allegation that the *413 discharge had occurred "on or about March 12, 1977." Again, the claim form contained the exhibit referring to the fact that there had been separate additional discharges. In addition, another exhibit was attached describing gasoline leakages which the Township had discovered as late as June 1978.
The Administrator responded on April 9, 1980. In his letter denying the Township's second amended claim, the Administrator noted that amendatory legislation had clarified the situation and that only claims filed for discharges occurring after the effective date of the Act were compensable.
The matter apparently remained dormant until January 12, 1983 when the Township filed a complaint in the Superior Court, Chancery Division, in which it sought an order directing the Fund to process its claim. The case was subsequently transferred to the Law Division and, thereafter, ultimately to the Appellate Division because the Fund's decision constituted a final state administrative agency determination. R. 2:2-3(a)(2). See also Jos. L. Muscarelle, Inc. v. State, by Transp. Dept., 175 N.J. Super. 384, 393 (App.Div. 1980), certif. granted 85 N.J. 484 (1980), app.dism. 87 N.J. 321 (1981).
A preargument conference was conducted on February 21, 1985. At the conference, the Township noted its position that the Act should be applied retroactively to spills occurring prior to its effective date. Alternatively, the Township argued that the Administrator had erroneously considered its claim as derived from a single pre-Act spill, when in actuality the water contamination and damages caused thereby resulted from several separate discharges, some of which occurred after April 1, 1977. Pursuant to Judge Seidman's suggestion, the Township moved for a limited remand to permit the Administrator to determine whether the claims that had been submitted properly raised the issue of post-Act discharges. The Township asked to be permitted to file a third amended claim should the Administrator *414 determine that the prior claims did not raise this issue. We granted the Township's motion.
Thereafter, the Administrator determined that the claims submitted by the Township had not explicitly raised the issue of post-Act discharges. The Township filed a third amended claim which alleged that there were multiple and continuing spillages after the initial discharge on March 12, 1977. Attached to the Township's third amended claim were several internal DEP memoranda which indicated that there was substantial evidence of discharges occurring after the effective date of the Act.
Finally, on July 26, 1985, the Administrator denied the Township's third amended claim. As we noted previously, the Administrator predicated the Fund's denial on two separate bases. First, he declared that the third amended claim was not filed within "one year after ... discover[y] [of the] damages" as required by N.J.S.A. 58:10-23.11k. Second, he stated that the claim was facially ineligible since it was based upon a discharge which occurred prior to April 1, 1977.

I
We first address the Fund's procedural argument that the Township's appeal was untimely and should, thus, be dismissed without a consideration of the merits of the contentions advanced. R. 2:2-3(a)(2) provides that "appeals may be taken to the Appellate Division as of right ... to review final decisions or actions of any state administrative agency or officer...." Such an appeal must be "taken within 45 days from the date of service of the decision or notice" of the final determination of the agency. R. 2:4-1(b). While it is arguable that the Administrator's letter of September 4, 1979 did not constitute a "final decision" because further agency review and evaluation was promised "following the court decision" on the retroactivity question, the letter of April 9, 1980 represented a *415 clear and unequivocal denial of the Township's claim. The Township's failure to file a notice of appeal or take further legal action until some three years later is inexcusable.[2] While we recognize that in the interim the Township was attempting to negotiate a settlement with several oil companies responsible for the discharges, we perceive no valid justification for its delay in appealing the Fund's determination.
While we find the Township's inattention to our rules deeply disturbing, we nevertheless choose to decide this appeal on the merits.[3] We note that, despite obvious procedural irregularities, the Township's appeal from the Fund's denial of its third amended claim must be deemed timely. The Fund's determination was made pursuant to our order of remand. Although the Township should have filed a notice of appeal from the Fund's denial of its third amended claim, its failure to do so is excusable since this appeal was already pending. We thus find the Township's dereliction in that regard de minimis. We emphasize that this litigation is of public importance and urgently requires final adjudication.

II
We next consider the Fund's argument that the Township's third amended claim was untimely because it was filed more than one year after discovery of the damages caused by the *416 discharges. As we have noted, this formed one of the bases for the Fund's rejection of the Township's claim.
Prior to its amendment (L. 1984, c. 142, § 3), N.J.S.A. 58:10-23.11k provided that "[c]laims shall be filed with the administrator not later than [one] year after the date of discovery of damages nor later than [six] years after the date of the incident which caused the damage." The record clearly discloses that the Township's initial claim, submitted on January 11, 1978, was timely because it was filed within one year of March 12, 1977, the date that the damage was discovered, and, thus, fully comported with the statutory time requirement. In our view, the Township's amended claims related back to the date of the filing of its initial request for compensation. We stress that the situation was fluid and the investigation of the causes of the contamination of the Township's water supply was ongoing. This is apparent from a reading of the mayor's letter which accompanied the initial claim as well as the exhibits which were attached. It is also obvious from our review of the various amended claims submitted. We also note that N.J.A.C. 17:26-1.6(c) expressly permits spill compensation claims to be amended "as to the nature or extent of the damage, [its] cause ... or the amount of the claim." Although the regulations do not specifically direct that amended claims are to relate back to the date of the initial request for compensation, we are of the view that this can fairly be inferred.
We are unpersuaded by the Fund's argument that the Township abandoned its claim by failing to take any action during the three year period after the Administrator's letter of April 9, 1980. The record reflects that the Township was seeking to recover damages from various oil companies during this period. In short, we do not perceive this effort of the Township to preserve the Fund's assets as demonstrating an intent on its part to abandon its claim.

*417 III
We, thus, proceed to the Township's argument that the Fund is liable for damages caused by pre-Act discharges. The identical argument was recently considered and rejected in Atlantic City Municipal Utilities Auth. v. Hunt, 210 N.J. Super. 76 (App.Div. 1986). There, we held that the strict liability provision of N.J.S.A. 58:10-23.11g(a) was prospective in nature except with regard to the DEP's ability to recover for its cleanup and removal costs incurred in removing hazardous substances discharged before the passage of the Act. Id. at 91. That holding is fully applicable here. The Fund is not liable for damages caused by pre-Act discharges.

IV
The Administrator determined that all of the damages sought to be recovered by the Township were the result of discharges which occurred prior to the effective date of the Act. We conclude that this finding is not supported by adequate credible evidence present in the record. Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 93 (1973).
Initially, we note that the meager record is largely uninformative with regard to the extent to which the Township's damages were caused by post-Act discharges. Nevertheless, the factual determination of the Administrator is clearly belied by references in several DEP internal memoranda which were submitted in conjunction with the Township's third amended claim. The pertinent portions of these memoranda read as follows:
[T]here is reason to believe that this discharge is a continuing one in any sense of the term. Leaking tanks were discovered in the area after April 1, 1977 as well as before that date, and it is possible that there is still a leaking tank which is contributing to the ongoing gasoline pollution.
* * * * * * * *
Although the discharge which caused the gasoline contamination in the well field certainly began before April 1, it probably did not end before that date. On the contrary, there is significant evidence to indicate that gasoline leakage continued after the effective date of the Spill Compensation and Control Act:

*418 1. The wells have remained almost continuously polluted despite pumping to waste.
2. At least two and possibly three leaking tanks were discovered after April 1  the latest in June.
[W]hat we have here is a spill of unknown origin, which began before the effective date of the Spill Act but has continued into the present. There may still be an untested tank leaking into the field....
* * * * * * * *
Although a known gasoline spill took place in the vicinity of the well field at Carr's Gulf service station in February 1977, it is by no means certain that this was the source of the contamination first detected in March. In fact, Gulf Oil Company officials claim to have recovered almost all the gasoline that was lost. In April, investigators from this Division identified at least 20 potential sources for the pollution in the wells, including ten gasoline stations. Fortunately, the major oil companies have been cooperative. In April and May they agreed to voluntarily pressure test the tanks they own in the area. These tests were completed by the end of July and resulted in the detection in June of at least two leaking tanks. Also, in May, a leaking tank was reported by a Shell dealer in neighboring Maplewood, though the loss of product is disputed by Shell Oil itself.
* * * * * * * *
Although gasoline contamination in the South Orange well field was first detected before the effective date of the Spill Act (April 1, 1977), it has continued beyond the February spill at Carr's Gulf, or from an earlier spill, it is equally likely that the source is a still-untested tank which is still leaking. We may never know.... Our position, in short, is that the available information indicates the likelihood of a discharge  in the strictest sense, that of a leaking tank, and not just the migration of oil deposited earlier which continued [a]fter April 1, 1977.
Our reading of the sparse record convinces us that a genuine issue of fact is presented with regard to the extent to which post-Act discharges contributed to the Township's continuing problems pertaining to the contamination of its water supply. The Spill Act defines a discharge as:
... any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State, when damage may result to the lands, waters or natural resources within the jurisdiction of the State.... [N.J.S.A. 58:10-23.11b(h).]
*419 We construe that definition of discharge as meaning "a release into the air, water or land of a hazardous or toxic substance." Atlantic City Municipal Utilities Auth. v. Hunt, supra, 210 N.J. Super. at 96. If a discharge occurred before the original Act, the effects of that discharge are not covered. Id. at 98. Further, "continuing contamination from an old spill is not a present discharge." Ibid.
Here, however, there is evidence that discharges of gasoline commenced prior to April 1, 1977 and continued long after that date. There is evidence that continued "pumping to waste" did not alleviate the contaminated condition of the wells. While this continuing contamination could have been caused by the migration of pre-Act discharges, it may also have been caused by post-Act discharges. In our view, damages caused by discharges continuing after April 1, 1977 are compensable.[4] Furthermore, any continued seepage from tanks after April 1, 1977 which contributed to the contaminated condition of the wells constitutes a post-Act discharge and is also compensable. While we recognize that it may be extremely difficult to segregate and distinguish between damages caused by post-Act discharges and those caused by pre-Act discharges, we are convinced that the statutory scheme compels that this be done.
We are, thus, constrained to reverse the Fund's determination and remand for proceedings consistent with this opinion. We note that when the validity or amount of a claim is contested, the Administrator is statutorily required to convene a board of arbitration. N.J.S.A. 58:10-23.11n(a). We are convinced that the record presents substantial factual questions mandating that course. Accordingly, the determination of the Fund is reversed and the matter is remanded for further proceedings.
NOTES
[1] N.J.S.A. 58:10-23.11k provided that "[c]laims shall be filed with the administrator not later than [one] year after the date of discovery of damage nor later than [six] years after the date of the incident which caused the damage." On September 6, 1984, the statute was amended. It currently states that "[c]laims shall be filed with the administrator not later than one year after the date of discovery of damage." See also N.J.A.C. 17:26-1.5.
[2] The Township incorrectly sought review of the Fund's determination by filing an action in the Superior Court, Chancery Division. As noted above, the appeal should have been taken to this court. R. 2:2-3(a)(2). Although the case was erroneously transferred to the Law Division, the Law Division properly transferred the matter to this court. R. 1:13-4(a) allows a court to transfer a matter over which it does not have jurisdiction to a court or agency which does have jurisdiction.
[3] We suggest for future guidance that where an appeal has been improvidently filed, respondent has the responsibility to file a timely motion to dismiss. Delbridge v. Jann Holding Co., 164 N.J. Super. 506, 509, n. 1 (App.Div. 1978).
[4] Atlantic City Municipal Utilities Auth. v. Hunt, supra, is not inconsistent with our holding here. We emphasize that the Atlantic City case concerned, in part, "continuing contamination from an old spill...." Id. at 98. In contrast, this appeal hypothesizes contamination caused by discharges continuing after April 1, 1977.