775 A.2d 222 (2001)
341 N.J. Super. 294
WHITE OAK FUNDING, INC., Plaintiff-Appellant,
v.
George WINNING, Defendant, and
Robert L. Scarborough, Karen M. Scarborough, and Thomas Page, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted May 7, 2001.
Decided July 6, 2001.
*223 Porzio, Bromberg & Newman, Morristown, for appellant (Robert C. Epstein, on the brief).
Evans, Osborne & Kreizman, Ocean, for respondents Robert L. Scarborough and Karen M. Scarborough (Mary O'Keefe Massey, on the brief).
Arbus, Krenkel & Monaghan, for respondent Thomas Page, joins in the brief submitted by respondents Robert L. Scarborough and Karen M. Scarborough.
Before Judges WEFING, CUFF and LISA.
The opinion of the court was delivered by LISA, J.A.D.
In this Spill Act case, plaintiff appeals from an order denying its motion for partial summary judgment on the issue of liability and granting the summary judgment motions of defendants, Robert L. Scarborough, Karen M. Scarborough and Thomas Page,[1] dismissing its complaint. Plaintiff sought to recover for contamination damage to its property, alleging that defendants, prior owners of the property, were liable under the Spill Act as "dischargers" or as persons "in any way responsible." N.J.S.A. 58:10-23.11g(c)(1). The motion judge determined that defendants do not meet this definition and are not liable. We agree and affirm.
The parties filed cross-motions for summary judgment based upon undisputed facts, established substantially by a joint stipulation of facts, as well as other materials. The property, in Eatontown, was owned by George Winning from 1976 to 1983, who conducted a fuel oil distribution business. Winning maintained an above-ground oil tank on the property for use in his business. The Scarboroughs purchased the property from Winning in 1983, on which they conducted a photocopy service until they sold it to Page in 1986, who thereafter operated a florist shop.
Prior to purchasing the property, the Scarboroughs knew a fuel oil distribution business had been conducted there and they knew there had been an above-ground oil tank. The tank had been removed prior to their inquiry into the purchase of the property. At that time, the open area behind the building was covered with gravel stones. The Scarboroughs conducted no environmental inspection or testing prior to purchase; they did not consider the possibility of any contamination problem from the former fuel oil business. They did obtain a title search, survey and termite inspection. They conducted their own physical inspection, and *224 upon inspection by the municipality they received a certificate of occupancy.
When the Scarboroughs sold to Page, they realized a gain from their purchase price. Page obtained a mortgage. Eventually the florist business failed and the mortgage went into foreclosure. Plaintiff acquired the $112,000 mortgage for $17,500, completed the foreclosure, and purchased the property at sheriff's sale for $100 in 1998. After acquiring title, plaintiff learned the property was contaminated. Plaintiff notified the Department of Environmental Protection ("DEP") and requested that the DEP direct prior owners to remediate the property. The DEP sent a cleanup directive only to Winning.[2]
Plaintiff's expert opines that the fuel oil contamination probably occurred during Winning's ownership, that the property was contaminated with fuel oil as of 1983, that the contamination presently extends to both on-site and off-site soils and groundwater, and that limited environmental testing (such as groundwater sampling and analysis) would have revealed the contamination. He further certified that the nature of fuel oil is to migrate and spread and it is therefore probable that, without remediation efforts, fuel oil contamination will become more extensive and widespread over time. He concluded it is highly probable that between 1983 and 1986, the contamination migrated and spread, such that in 1986, the contamination was more extensive and widespread than in 1983.
The Spill Act provides: "Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g(c)(1). A "discharge" is defined in the Act as, "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State." N.J.S.A. 58:10-23.11b.
Plaintiff first contends the Scarboroughs are liable as dischargers. Plaintiff argues the Scarboroughs committed an unintentional omission resulting in a releasing of the fuel oil during their ownership of the property. The omission, according to plaintiff, consists of "the Scarboroughs' utter failure to conduct environmental due diligence before purchasing the property, and subsequent failures to report the contamination to DEP or take any steps to contain the spreading fuel oil." Plaintiff looks to two sources to define "release," which is not defined in the Spill Act: (1) the federal analogue to the Spill Act, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601-9675; and (2) the dictionary definition.
The CERCLA definition of "release" is: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment...." 42 U.S.C. § 9601(22). This definition is broader than that encompassed in the Spill Act definition of "discharge" as it incorporates passive activity. Most significantly, it includes "leaching," the process or an instance of separating the soluble components from material by percolation, a term commonly used in the environmental context to describe the migration of contaminants. *225 United States v. CDMG Realty Co., 96 F.3d 706, 715 (3d Cir.1996).
However, this expansive definition is not included in the Spill Act. We reject plaintiff's contention that we should adopt the CERCLA definition of "release." "If it had been the legislature's intent to include within the scope of the statute a continued flowing or issuing out of past discharges, then the statutory definition would so state." State, Dep't of Envtl. Prot. v. J.T. Baker Co., 234 N.J.Super. 234, 245, 560 A.2d 739 (Ch.Div.1989), aff'd, 246 N.J.Super. 224, 587 A.2d 279 (App.Div.1991). New Jersey courts have consistently interpreted the definition of "discharge" to exclude the migration of hazardous substances already present in the soil or in groundwaters. See J.T. Baker Co., supra, 234 N.J.Super. at 240, 560 A.2d 739; State, Dep't of Envtl. Prot. v. Arky's Auto Sales, 224 N.J.Super. 200, 207, 539 A.2d 1280 (App.Div.1988); Township of South Orange Village v. Hunt, 210 N.J.Super. 407, 417-19, 510 A.2d 62 (App.Div.1986); Atlantic City Mun. Utils. Auth. v. Hunt, 210 N.J.Super. 76, 96-100, 509 A.2d 225 (App.Div.1986). In Atlantic City Mun. Utils. Auth., for example, we stated:
the Legislature did not intend either that contamination be considered a discharge or that, if a discharge occurred before the Act but the effects continued after, the effects were covered under the Act for all purposes. We also conclude that a discharge is some action resulting in an environmental effect caused by an interaction with the environment. Contamination is not such an action but it is the result.
[210 N.J.Super. at 99-100, 509 A.2d 225.]
Imposition of Spill Act liability as a discharger requires some act or omission of human conduct which causes a hazardous material not previously present to enter the waters or land. Id. at 96, 509 A.2d 225. Liability does not result from passive migration of a hazardous material that previously entered the site. Ibid. "Release" must be interpreted in relation to the other terms with which it is placed in N.J.S.A. 58:10-23.11b. "The court fulfills its role by construing a statute in a fashion consistent with the statutory context in which it appears." Grubb v. Borough of Hightstown, 331 N.J.Super. 398, 406, 751 A.2d 1119 (Law Div.2000)(citing Waterfront Comm'n of New York Harbor v. Mercedes-Benz, 99 N.J. 402, 493 A.2d 504 (1985).) In this context, we conclude that release is but one means by which entry of a hazardous substance may occur, others being by spilling, leaking, pumping, pouring, emitting, emptying or dumping. The common thread running through these terms is that they all describe methods by which a substance can be transferred from a vessel, vehicle, pipe, container, or any other source onto the land or into the water. We have previously endorsed this interpretation:
We conclude that the Legislature intended "discharge" to mean a release into the air, water or land of a hazardous or toxic substance. The pouring of hazardous waste on the ground was a discharge. The placement of the waste stored in containers was not a discharge because there was and has been no interaction with the environment.
Plaintiff here contends that continuing contamination over the years by leaching constitutes a discharge. We disagree with this. Defendant disagrees with the [trial] judge's conclusion that a discharge occurred when drums containing hazardous substances were placed at the site. We accept defendant's interpretation on this score. Service Armament Co. v. Hyland, 70 N.J. 550, 561, 362 A.2d 13 (1976). Since the drums *226 have not started leaking, no "discharge" has occurred.

[Atlantic City Mun. Utils., supra, 210 N.J.Super. at 96, 509 A.2d 225.]
Plaintiff's reliance on the dictionary definition of "release" is unpersuasive. Plaintiff notes various definitions, including "the act of permitting a ... fluid to escape," citing Webster's Third New International Dictionary, Unabridged (1996). This definition, however, describes a discreet event by which a fluid is permitted to escape from its prior container or pipe, for example, onto the land or into the water. It is far afield from the concept of the continuous process of passive migration or leaching. A similar argument was rejected in J.T. Baker, Co., supra, 234 N.J.Super. at 245, 560 A.2d 739.
Plaintiff further contends the Scarboroughs are liable as persons "in any way responsible" for the contamination. This is so, according to plaintiff, because the Scarboroughs were aware of the prior use of the property as a fuel oil distribution business with an above-ground tank, they conducted no environmental due diligence prior to purchase, they used the property commercially and sold it for a profit, and during their ownership the pre-existing contamination migrated and spread. These circumstances, however, are devoid of the critical factor which triggers liability under this provision: the person must be in any way responsible for the discharge that caused the contamination.
In State, Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 502, 468 A.2d 150, our Supreme Court interpreted the phrase "in any way responsible," and stated that while subsequent acquisition of land on which hazardous substances have been previously dumped may be insufficient to hold the owner responsible, "[o]wnership or control over the property at the time of the discharge, however, will suffice." The Scarboroughs had neither ownership nor control over the property when the discharge of fuel oil onto the land occurred, during Winning's ownership. Our Supreme Court has applied this same principle in Marsh v. Department of Environmental Protection, 152 N.J. 137, 703 A.2d 927 (1997), where it held that Marsh was a responsible person not because of any lack of due diligence on her part and not because she actively discharged any pollutants, "but because the underground gasoline tanks leaked during Marsh's ownership of the property." Id. at 146, 703 A.2d 927.
In this pre-ISRA[3] situation, neither lack of due diligence under the circumstances of this case nor the other circumstances advanced by plaintiff bring the Scarboroughs within the ambit of the Spill Act's "in any way responsible" provision. In these circumstances, passive migration of pre-existing contamination does not result in Spill Act liability.
Affirmed.
NOTES
[1] Although plaintiff's notice of appeal is from the entire judgment of the Law Division, which includes the judgment in favor of Page, plaintiff has presented no arguments on appeal with respect to Page.
[2] Winning was named a defendant, but filed for bankruptcy, resulting in a stay of the action against him.
[3] For properties purchased after September 14, 1993, the Industrial Site Recovery Act (ISRA) applies and imposes a responsibility to investigate for hazardous substances as a condition of being absolved from Spill Act responsibility. Marsh, supra, at 141, 703 A.2d 927. ISRA "established a `new defense' to Spill Act liability for landowners who acquired their property after it had been contaminated and who could prove that they conducted such an investigation." Id. at 147-48, 703 A.2d 927.