STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF, v. J.T. BAKER CO., DEFENDANT.

Superior Court of New Jersey
Chancery Division Somerset County

Decided April 28, 1989.

*Peter N. Perretti, Jr.,* Attorney General of New Jersey, *Ronald P. Heksch,* Deputy Attorney General, appearing for the State.

*Robert J. DelTufo,* appearing for defendant (*Hannoch Weisman, P.C.*)

*Theodore L. Garrett,* appearing for defendant, pro hac vice (*Covington & Burling,* Washington D.C.)

DIANA, A.J.S.C.

The case of *State of New Jersey, Department of Environmental Protection v. J.T. Baker Co.* is before the court on defendant's motion for summary judgment on counts three and five of the complaint. As part of this motion, defendant, J.T. Baker Company, requests several rulings on issues concerning the retroactivity of the penalty provisions and interpretations of the spill compensation and control act of 1976,[1] ("Spill Act"), and of the Water Pollution Control Act of 1977,[2] ("WPCA"): to wit, that:

1. That a discharge under the spill act and the WPCA is a new release from a contained area and that continued leaching and contamination is not a discharge,

2. That Baker cannot be subject to penalties for discharges occurring prior to the 1977 effective dates of the spill act and of the WPCA, *and,*

3. Thus, that Baker is not subject to penalties for discharges of DDT which occurred only in the 1940's.

To the extent that this motion is for a judgment on issues of law which would obviate the need for presentation at trial of irrelevant evidence, it can be characterized as a motion *in limine.* Assuming that it prevails on the aforementioned issues, Baker seeks summary judgment as to counts three and five of the complaint based on the DEP's failure to specifically identify the post–1977 discharges which are alleged to be violations of N.J. Environmental Laws, Rules and Regulations.

J.T. Baker Co., has operated a chemical company in Phillipsburg, N.J. since approximately 1904. Baker's facility consists of approximately 60 acres on the east bank of the Delaware river, 1.5 miles upstream from the confluence of the Lehigh and Delaware rivers. The facility handles, stores, treats and disposes of a variety of hazardous substances and solid and hazardous wastes, and is thus subject to regulation by the state

---

[1] *N.J.S.A.* 58:10–23.11, *et seq.,* L.1976, c. 141, Ed. April 1, 1977.

[2] *N.J.S.A.* 58:10A–1 *et seq.,* L.1977, c. 74, approved April 25, 1977, provided: "This act shall take effect ninety days after enactment."

of New Jersey, Department of Environmental Protection, (The "DEP").

In early 1984, Baker was considering whether to merge with another Chemical Company. During the course of merger discussions, Baker commenced an environmental assessment with the intention of seeking DEP approval under the New Jersey ECRA Law if a merger materialized.[3] Although the contemplated merger never materialized, Baker discovered a great deal of contamination at its Phillipsburg plant that was caused, in large part, by events occurring decades ago. Thousands of pounds of hazardous substances and wastes were identified in the soil and groundwater at the Phillipsburg site and high levels of contamination were found in sediments in the Delaware River adjacent to and downstream from the site.

Upon completion of its assessment in July 1985, Baker submitted its report to the DEP and voluntarily represented that it was willing to undertake necessary remedial action to clean up the plant site. The next one and one half years were spent further delineating the pollution in and about the plant site and developing a clean up plan. In April 1987, the DEP issued a directive pursuant to the Spill Act advising Baker that unless it agreed to clean up the pollution and provide the necessary assurances that the work would be done properly, the DEP would use public funds to conduct the clean up and would seek three times the money expended in a subsequent cost recovery action pursuant to *N.J.S.A.* 58:10–23.11f(a).

In May of 1987 Baker agreed to enter into an administrative consent order with the DEP providing for remediation of the contamination. However, the parties were unable to agree upon the amount of penalties to be assessed. The DEP con-

---

[3]Under the Environmental Cleanup Responsibility Act (ECRA), *N.J.S.A.* sections 13:1K–6–33 (West Supp.1988), NJDEP traditionally requires that, before such a transfer of a company occurs, the company undertake an environmental assessment and either demonstrate the absence of significant contamination or agree upon a cleanup plan.

tended that substantial penalties were warranted under the various statutes that Baker had violated. Because the pollution had been brought to the DEP's attention upon completion of the 1984–1985 assessment and because Baker had assumed responsibility for the clean up of the pollution, Baker contended that no penalties were warranted.

Given the views of the parties regarding penalties, the present litigation ensued. This action is not about remediation costs, since Baker has undertaken to clean up the site. This action is about penalties.

Pursuant to the authority granted to it under *N.J.S.A.* 13:1D–1, *et seq.,* the DEP filed an eight count complaint against Baker and its Parent Company, Richardson–Vicks, Inc. In this complaint, the DEP seeks injunctive relief, costs and penalties pursuant to the Water Pollution Control Act ("WPCA"), *N.J.S. A.* 58:10A–1, *et seq.,* The Solid Waste Management Act ("SWMA"), *N.J.S.A.* 13:1E–1, *et seq.,* and The Spill Compensation and Control Act ("The Spill Act"), *N.J.S.A.* 58:10–23.11, *et seq.* for years of alleged environmental abuse at the Phillipsburg site.

Briefly, the counts which are the subject of the instant motion can be summarized as follows.

Count three alleges that the investigation conducted by Baker in 1984–85, in an effort to comply with ECRA requirements, revealed gross contamination of the soils and waters underlying and surrounding the Phillipsburg site which was and is discharging into the Delaware river. Paragraph 3 of this count fully describes the contamination (including the extent of DDT contamination) and concludes that the majority of the contaminants are classified as "hazardous substances" under N.J. LAW. The DEP claims that Baker's actions and/or omissions which resulted in this contamination constitute a "continuing discharge" of hazardous substances in violation of the spill Act, particularly *N.J.S.A.* 58:10–23.11c. Therefore, even though Baker has agreed to clean up the contamination, the DEP seeks

to impose costs and per diem penalties for "years of environmental abuse and pollution resulting from its unlawful discharges of hazardous substances."

In count five, the DEP seeks costs and penalties under the WPCA for numerous, unspecified, alleged discharges of hazardous substances by Baker into the soil and groundwater and into the Delaware river.

The Spill Act defines a "discharge" as

Any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters of the state or onto lands from which it might flow or drain into waters outside the jurisdiction of the state when damage may result to the lands, waters or natural resources within the jurisdiction of the state.

*N.J.S.A.* 58:10–23.11b(h).

This definition has been consistently interpreted by the courts of this state to exclude the migration of hazardous substances already present in soil or ground waters. *See, Department of Environmental Protection v. Arky's Auto Sales,* 224 *N.J.Super.* 200, 207 (App.Div.1988); *Atlantic City Mun. Utilities Authority v. Hunt,* 210 *N.J.Super.* 76 (App.Div.1986); *Township of S. Orange Village v. Hunt,* 210 *N.J.Super.* 407 (App. Div.1986); *Cf. State v. Exxon Corp.,* 151 *N.J.Super.* 464, 471 (Ch.Div.1977) (proof that prior owner of defendant's property saturated ground with petroleum that was leaching into surrounding properties did not establish that defendant was "discharger" within meaning of Water Quality Improvement Act, *N.J.S.A.* 58:10–23.1 to –23.10, repealed by Spill Act.) *Quoting, VI–Concrete v. State of New Jersey Department of Environmental Protection,* 115 *N.J.* 1, —— (1989).

In both of the *Hunt* cases, the plaintiff-municipalities sought to compel the spill fund to assume the expense of remedying contamination from pre-act discharges. The appellate division expressly rejected the contentions of these plaintiffs that continuing contamination over the years by leaching constituted a discharge. In *Atlantic City v. Hunt,* 210 *N.J.Super.* at 99–100, the court held that:

... Judge Perskie was correct in concluding that the legislature did not intend either that contamination be considered a discharge or that, if a discharge occurred before the act but the effects continued after, the effects were covered under the act for all purposes. We also conclude that a discharge is some action resulting in an environmental effect caused by an interaction with the environment. Contamination is not such an action but is the result.

*Accord, Township of S. Orange Village*, 210 *N.J.Super.* at 418–19.

■ The DEP attempts to distinguish the aforementioned cases from that at bar based on the fact that those cases dealt with claims against the Spill fund for remediation costs and not the imposition of penalties against polluters. This distinction is not supported by the relevant provisions of the Spill Act. The definition of the term "discharge" is the same throughout. The term is not defined differently with respect to penalty sections of the act, (i.e. *N.J.S.A.* 58:10–23.11g), than it is defined with respect to remediation sections of the act, (i.e. *N.J.S.A.* 58:10–23.11u).

Although section 10–23.11x mandates that the act be liberally construed, it does not require that the term "discharge" be interpreted differently with respect to each provision of the statute. As Chief Justice Vanderbilt stated in *State v. Meinken*, 10 *N.J.* 348, 352 (1952):

[W]here a group of laws are both remedial and penal ... those provisions which are remedial are to be liberally construed and those that are penal are to be strictly construed.... a penal statute is not to be extended by implication or intendment ...

As I will discuss further with respect to the retroactivity issue, the construction of the term "discharge" which the DEP urges me to adopt with regard to penal sections of the act would no doubt lead to irrational and unjust results and cannot be favored. *See,* 2A *Sutherland Stat. Const.* § 45.12 at 54. (4th Ed.1986).

The DEP also relies on the decision of the supreme court in *State of New Jersey, Dep't. of Environmental Protection v. Ventron*, 94 *N.J.* 473 (1983) to support its position that Baker can be penalized for a continuing violation of the Spill Act by virtue of its failure to abate contamination from past dis-

charges. This reliance is misplaced and the proposition advanced is not supported either by the case law, the statute, or by the DEP's pleading.

The *Ventron* case held polluters strictly liable for the costs of cleaning-up contamination from past discharges. The court did not discuss whether the legislature intended to impose penalties for the discharges that occurred prior to the act's enactment. As the appellate division held in *Atlantic City v. Hunt,* 210 *N.J.Super.* at 89–90, the fact that the Spill Act imposes retrospective liability for abatement costs does not mean that the entire statute was intended to have retrospective application. Each provision must be examined separately. Thus, the fact that the spill act was held by the *Ventron* court to impose liability for abatement costs related to past discharges does not mean that penalties were intended to be imposed for such contamination.

The DEP also buttresses its argument that Baker should be penalized for its ongoing failure to remediate the contamination at its site by pointing to the penalty provisions of the Spill Act. This act provides in relevant part that:

Any person who ... otherwise violates any of the provisions of this act or any rule promulgated thereunder shall be liable to a penalty of not more than $50,000.00 for each offense.

*See, N.J.S.A.* 58:10–23.11u.

Although the DEP points to the numerous provisions of the Spill Act which impose the responsibilities of clean-up on polluters, it can point to no provision which makes failure to remedy contamination a punishable violation of the act. A review of the entire Spill Act reveals that although penalties are appropriate when an act or omission results in a discharge, there is no provision which indicates that an ongoing failure to remedy is an omission which would subject the offender to penalties under the act.

At argument on this motion, the DEP proposed that it would be unfair to treat Baker in the same manner as those polluters who, upon passage of the Spill Act and the WPCA in 1977,

responsibly and voluntarily abated the effects of their past discharges. Although the statutory scheme supports this proposition, it does not provide for imposition of the penalties which the DEP contends are warranted by Baker's failure, until 1985, to remedy the contamination at their site.

The Spill Act addresses the need for abatement in an effective and ingenious manner. The legislature created the "Spill Fund" to be used whenever those responsible for contamination refused or otherwise failed to remedy that contamination. Upon use of monies from this fund, the state can seek recovery of three times the cost of clean up from the polluter, and can create a lien on the polluter's property. This lien and treble damage award provide an incentive to polluters to clean up the results of their contamination and, along with the penalties which are available under the act, provide capital for the Spill fund. By imposing treble damages and a lien on property of those who fail to recognize their duty to abate contamination the Spill Act treats these polluters differently from those who do recognize their duty under the act.

The DEP also suggests that the court should read more into the complaint than is actually plead. The DEP does not allege in its complaint that Baker's failure to abate the contamination from past discharges is an omission for which it should be penalized. The only omissions by Baker which are referred to in the DEP's pleading as creating punishable violations are those alleged omissions which resulted in discharges and which would subject Baker to penalties for violating the prohibition of section 10–23.11c. The DEP's argument that the court should consider Baker's failure to abate as part of the present action should have been made in conjunction with a motion to amend the complaint so that the issue could have been more fully addressed.

The DEP attempts to avoid the problems in its pleadings and to infer a violation of the Spill Act from Baker's failure to remediate by characterizing the residual effects of a pre-existing discharge as a present discharge. As noted previ-

ously, such a construction of the term "discharge" is impermissible. Therefore, I conclude that as a matter of law, for the purposes of the Spill Act, a discharge is a new release from a contained area and that continued leaching and contamination from pre-enactment discharges does not subject Baker to penalties.

■ Baker urges this court to adopt a similar ruling with respect to the WPCA, and relies on the reasoning of the *Exxon, Arky's Auto,* and *Hunt* courts to support the contention that the interpretation of the term "discharge" should be the same for both acts. However, I hesitate to apply the principles stated in those cases to the WPCA. As the supreme court acknowledged in its April 19, 1989 opinion in *Vi–Concrete Company v. State of New Jersey, Department of Environmental Protection,* at ——, "Because the statutory purposes differ, the decisions in *Hunt* and *Exxon* should not be accorded significant weight" with respect to the interpretation of the term "discharge."

The DEP's suggestion that the *Vi-concrete* case stands for the proposition that the term "discharge" can be interpreted as a continued leaching of contaminants must also be rejected. The supreme court's opinion in the *Vi–concrete* case shows a concern for balancing the WPCA'S goals of cleaning up and preventing further contamination of the waters of the state, and the burden that can legitimately be placed upon property owners for the effects of discharges from a contained area that was created before the act was enacted. It found that where the DEP had not identified discharges from a closed landfill, it was not even appropriate for the DEP to require the owner to install monitoring devices. Since penalties such as those sought in the case at bar are a far more serious burden than the costs associated with monitoring, it seems clear that penalties under the act for the continued effects of past discharges would not be allowed.

■ As to whether these continued effects can be characterized as "new releases" each time hazardous substances leach

into the state's waters, it is necessary to examine the definition of the term "discharge" under the WPCA, along with the goals of that act. In order to "restore, enhance and maintain the chemical, physical and biological integrity of [the state's] waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water," the legislature established a permit system to regulate the discharge of pollutants, and made it unlawful for any person to discharge any pollutant, except in conformity with a valid permit. See, *N.J.S.A.* 58:10A–1, *et seq.*

The definition of the term "discharge" under the WPCA is substantially similar to the definition used by the Spill Act.

"Discharge" means the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of a pollutant into the waters of the state or onto land or into wells from which it might flow or drain into said waters, and shall include the release of any pollutant into a municipal treatment works.

To determine the legislative intent, this plain language must first be considered. *See, Kimmelman v. Henkels and McCoy, Inc.,* 108 *N.J.* 123, 128 (1987). As in the Spill Act, the words used to define the term "discharge" are gerunds, i.e. verbal noun[s] ... that express the action of the verb. *See, Webster's third new international dictionary,* (unabridged) p. 952. These words used to describe a discharge connote activity, even if that activity is accidental or unintentional. *See e.g., State v. Exxon Corp.,* 151 *N.J.Super.* at 471–72. For example, "release" as a verb is defined by Webster's as "to set free from restraint, confinement, or servitude." Similarly, "spilling" is defined as "to cause or allow accidentally or unintentionally to fall, flow or run out so as to be lost or wasted." Clearly the words used in section 10A–3 of the WPCA do not suggest that the legislature intended the term "discharge" to be read as a noun meaning "A flowing or issuing out." If it had been the legislature's intent to include within the scope of the statute a continued flowing or issuing out of past discharges, then the statutory definition would so state. However, it does not.

Therefore, I am constrained to conclude that as a matter of law, a discharge under the WPCA is also a new release from a contained area and that continued leaching, contamination, flowing out and issuing of pre-enactment discharges from the soil into the waters of this State do not subject Baker to penalties under the WPCA.

The next issue raised by Baker is whether the penalty provisions of the Spill Act and WPCA can be imposed retroactively. The penalty sections of both acts provide that "any person who ... violates ... this act, shall be [subject or liable] to a penalty of not more than $50,000.00 for each offense." The penalty sections of both acts are stated in the present tense; i.e. discharge *is* prohibited; violators *shall* be liable. Again, it is necessary to examine the plain meaning of the language used in this definition. *See, Kimmelman, supra.* It is well established that the use of the word "shall" connotes an intent to apply a statute prospectively so that it will not affect events which have already occurred. *Eyre v. Bloomfield Savings Bank*, 177 *N.J.Super.* 125, 129 (Ch.Div.1980).

The terms of a statute will not be given retrospective effect "unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intent of the legislature cannot otherwise be satisfied." *Kopczynski v. County of Camden*, 2 *N.J.* 419, 424 (1949); *Accord, South Hamilton Assoc. v. Mayor of Morristown*, 99 *N.J.* 437, 444 (1985); *Gibbons v. Gibbons*, 86 *N.J.* 515, 522 (1981); *Rothman v. Rothman*, 65 *N.J.* 219, 224 (1974); *see also*, 2 *Sutherland Stat. Const.* § 41.04 at 348 (4th Ed.1986).

Retroactive application of the penalty sections of the acts must also be justified by a rational legislative purpose. *See, Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 *U.S.* 717, 730, 104 *S.Ct.* 2709, 2718, 81 *L.Ed.*2d 601 (1984). Application of penalties for discharges that occurred prior to the passage of the Spill Act and the WPCA would serve no such rational purpose in this case. It could not be justified as a method of cost spreading since Baker has already agreed to pay

for the clean up of the site. Retrospective application could not serve the function of deterrence, since a penalty cannot deter past actions. Moreover, the supreme court has held that deterrence or blameworthiness are insufficient justifications for retrospective liability. *Cf. Usery v. Turner Elkhorn Mining Co.,* 428 *U.S.* 1, 17–18, 96 *S.Ct.* 2882, 2893–94, 49 *L.Ed.*2d 752 (1976). Prospective application of the penalty provisions would serve as a deterrent to future violations and encourage compliance. Retrospective application, as the instant case demonstrates, would serve no compelling purpose.

New Jersey courts have held that where the language of a precursor to the Spill Act was written in the present tense, and there was no indication that the legislature intended it to apply retrospectively, it should be given prospective application only. *State v. Exxon,* 151 *N.J.Super.* at 481–82. Although the Spill Act was amended in 1979 to clarify the imposition of retroactive liability for remediation, the courts have continued to hold that other portions of the Spill Act have prospective application only. See, *Atlantic City v. Hunt,* 210 *N.J.Super.* at 89–90.

Therefore, I conclude that the Spill Act and the WPCA cannot be applied retrospectively to penalize Baker for discharges that occurred prior to the enactment of those acts. To the extent that hazardous substances, including but not limited to DDT, were discharged prior to the enactment of these acts, the WPCA and the Spill Act do not provide for the imposition of penalties by the DEP.

■ In its final argument, Baker contends that with discovery now concluded, since the DEP cannot identify with specificity discharges by Baker occurring after the 1977 effective dates of the statutes involved, counts three and five should be dismissed.

Rule 4:46 of the rules governing the courts of the state of New Jersey provides that a litigant can move for summary judgment in his favor upon all or a part of the relief sought or as to any defense. The standard and procedure applicable is set forth in R. 4:46-2 which provides, in part that:

> The judgment or order sought shall be rendered forth with if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment as a matter of law.

The party moving for summary judgment must sustain the burden of establishing that no issue of fact exists. *See e.g., Judson v. People's Bank and Trust Co. of Westfield,* 17 *N.J.* 67 (1954). In the case at bar the DEP has shown by competent evidential material that genuine issues of material fact exist which preclude summary judgment. *See, Mosior v. Ins. Co. of North America,* 193 *N.J.Super.* 190, 195 (App.Div.1984); and *Robbins v. Jersey City,* 23 *N.J.* 229, 241 (1957).

In its brief in opposition to the instant motion, the DEP points to ample evidence of chemical releases at the Baker site during the years preceding the enactment of the Spill Act and the WPCA. For example, exhibit H attached to the DEP's brief is a list of 68 spills that occurred between 1978 and 1985 at the Baker plant site. Other spills and violations are noted in Exhibit I.

Based on the foregoing, Baker's motion for summary judgment in its favor dismissing counts three and five of the complaint is denied.