**In re ORIENTAL REPUBLIC OF URU-GUAY (Commando General de La Armada and Servicio de Bugues Auxiliares) as Owner and Operator of the M/V PRESIDENTE RIVERA for exoneration from or limitation of liability.**

Civ. A. No. 90–404–SLR.

United States District Court,
D. Delaware.

March 18, 1993.

Randall E. Robbins of Ashby & Geddes, Wilmington, DE, for plaintiffs Oriental Republic Uruguay, Presidente Rivera, Servicio de Bugues Auxiliares de La Armada and Captain Raul DiBarrart.

Jeanne L. Langdon, Esquire, and Keith A. Trostle of Delaware Dept. of Justice, Wilmington, DE, for claimant State of Del.

Michael B. McCauley of Palmer, Biezup & Henderson, Wilmington, DE, and Kevin G. O'Donovan of Palmer, Biezup & Henderson, Philadelphia, PA, for claimant Delaware Terminal Co.

Peter E. Hess, Esquire, Wilmington, DE, for claimants I Did the Delaware, Old Seventh Street Boat Yard, Inc., Up the Creek Restaurant and Bar, Inc., and Phillips Holding Co., Ltd.

Jeffrey Weiner of Law Offices of Jeffrey Weiner, Wilmington, DE, and Gerald J. Williams, Esquire, Mark R. Cuker, and Alan H. Casper of Williams & Cuker, Philadelphia, PA, for claimants Penns Grove New Jersey Residents.

Paul M. Lukoff of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE, and Edward C. Radzik, and James P. Krauzlis of Donovan, Parry, Walsh & Repetto, New York City, for claimant Petroleo Brasileiro S.A.

Wanda Chin Monahan of the Dept. of Law and Public Safety, Div. of Law, and Martin J. McHugh of the Hazardous Waste Litigation Section, Div. of Law, Trenton, NJ, for claimant State of N.J.

James S. Green of Duane, Morris & Heckscher, Wilmington, DE, and Francis J. Deasey of Deasey, Mahoney & Bender, Ltd., Philadelphia, PA, for claimant Sun Refining and Marketing Co.

Patricia C. Hannigan of the U.S. Atty.'s Office, Wilmington, DE, Michael McIntyre of the Environment & Natural Resources Div., EES, Washington, D.C.; and Peter F. Frost of the Torts Branch, Civil Div., Washington, DC, for claimant U.S.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

### I.  Factual and Procedural Background

This Court issued a Memorandum Opinion and Order in this case on October 13, 1992 granting, inter alia, the State of New Jersey's motion for partial summary judgment on its claim against the Oriental Republic of Uruguay as owner and operator of the M/V PRESIDENTE RIVERA (hereinafter "Limitation Plaintiff") for civil penalties under the New Jersey Water Pollution Control Act (hereinafter the "Pollution Control Act"), N.J.STAT.ANN. §§ 58:10A-1 to 58:10A-60, 806 F.Supp. 42. Limitation Plaintiff subsequently moved for reconsideration of that decision.

The Court granted Limitation Plaintiff's motion for reconsideration for the following reasons, which originally were set forth in this Court's Order of January 12, 1993:

In the Memorandum Opinion issued with the Court's Order granting New Jersey's motion for partial summary judgment, the Court concluded that "[a]lthough [Limitation Plaintiff's] position [that the Pollution Control Act does not apply to the Presidente Rivera oil spill] has some merit in that it seems somewhat anomalous to require an oil tanker to obtain a discharge permit before accidentally or negligently releasing oil into the water, . . . it appears that the weight of authority and the plain language of the statute are against [Limitation Plaintiff's position." (D.I. 147 at 6–7 (emphasis supplied)) The statutory provisions referred to by the Court in this passage were the following: (1) "It shall be unlawful for any person to discharge any pollutant [including oil] except in conformity with a valid New Jersey Discharge Elimination System permit...", N.J.STAT.ANN. section 58:10A–6(a) (1992); and (2) "'Discharge' means an intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, or dumping of a pollutant into the waters of the State....", Id. section 58:10A–3(e) (emphasis supplied).

In its Memorandum Opinion, the court quoted these statutory provisions from New Jersey's motion papers filed in support of its motion for partial summary judgment, although the Court confirmed that the 1992 version of the New Jersey Statutes Annotated contained this language. At that time, the Court assumed that this statutory language constituted

the law applicable to New Jersey's claim under the Water Pollution Control Act *since New Jersey represented it as such in its motion papers.* Limitation Plaintiff did not then and does not now contend otherwise. However, New Jersey's response to Limitation Plaintiff's motion for reconsideration indicates that the State's prior representations regarding the applicable statutory language may not have been accurate. In particular, New Jersey states the following in its letter memorandum:

> [T]he [Pollution Control Act] clearly provides for liability for accidental discharges and, in fact, the [Pollution Control Act] section which defines the term "discharge" was amended to reflect this and became effective on July 1, 1991. The amendment clarified a liability scheme contemplating either "an intentional or *unintentional* action or omission resulting in the releasing, spilling ..." (emphasis added) (*see* N.J.S.A. 58:10A–3(e)).

(D.I. 154 at 2) The Presidente Rivera oil spill occurred on June 24, 1989, nearly two years before these amendments became effective. Accordingly, the Court's decision granting New Jersey's motion for partial summary judgment as to its claim for civil penalties under the Pollution Control Act, based in part "on the plain language" of a statutory provision that may not be applicable to this case, shall be reconsidered.

The Court has obtained (from the archives of the Newark branch of the Third Circuit library) a copy of the New Jersey Statutes Annotated volume containing the statutory language which apparently was applicable in June 1989. Perhaps significantly, the term "discharge" formerly was defined under the Pollution Control Act as "the releasing, spilling, leaking, pumping, pouring, emitting, emptying, or dumping of a pollutant into the waters of the State...." N.J.STAT.ANN. section 58:10A–3(e) (1982). Contrary to New Jersey's position, it is not at all clear to the Court that the recent amendment to this definition of the term discharge, under which "discharge" is defined as "an intentional or unintentional action or omission resulting in the releasing [or] spilling" of a pollutant into the water, merely was intended to "clarif[y] [that the Pollution Control Act is] a liability scheme contemplating" imposition of liability for accidental or unintentional discharges of pollution. New Jersey cites no legislative history supporting this conclusion.

In light of the circumstances described above, it is clear that proper disposition of this claim requires additional briefing by the parties.

(D.I. 160 at 1–3) The parties submitted additional briefing on this issue in accordance with this Court's directive and the matter is now ripe for decision.

## II. Discussion

The 1989 version of the Pollution Control Act provides that "[i]t shall be unlawful for any person to discharge any pollutant, except in conformity with a valid New Jersey Pollutant Discharge Elimination System ["NJPDES"] permit...." *Id.* § 58:10A–6(a). New Jersey contends that this provision contemplates two types of statutory violations: (1) "the uncontrolled, unpermitted discharge of a pollutant;" and (2) "a discharge that violates the conditions of a NJPDES permit." (D:I. 166 at 2)

With respect to the second category of statutory violations, there is no dispute of record that a discharge that violates the conditions of a NJPDES permit is violative of the Pollution Control Act. Limitation Plaintiff takes issue, however, with the viability of the first category of statutory violations, arguing that it defies logic and is absurd to impose penalties on the owner of an oil tanker for failing to obtain a pollution discharge permit before *accidentally* spilling a massive quantity of oil into the state's waters. The Court agrees. However, New Jersey does not seek to impose liability as a result of Limitation Plaintiff's failure to obtain a discharge permit. Clearly no such permit could have been applied for or issued. Rather, New Jersey seeks to impose statutory penalties under the Pollution Control Act for Limitation Plaintiff's accidental and uncontrolled release of oil into the waters of New Jersey.

There is both statutory and caselaw authority indicating that the Pollution Control Act applies to accidental discharges of pollutants, including oil spills from tanker vessels. New Jersey and Limitation Plaintiff both agree that the version of the Pollution Control Act applicable in 1989 when the PRESIDENTE RIVERA discharged over 183,184 gallons of oil into the Delaware River did not contain the "intentional or unintentional" language indicating that the statute contemplates a scheme of strict liability. The former version of section 58:10A–3(e) nonetheless contains language indicating that it applies both to intentional and to accidental discharges of pollutants. Specifically, "discharge" was defined under the former version of the statute to include the "spilling [or] leaking ... of a pollutant into the waters of the State". The terms "spill" and "leak" connote accidental and unintentional activity. Indeed, New Jersey courts interpreting these terms in the context of environmental legislation, including the Pollution Control Act, have reached the same conclusion. *See State v. J.T. Baker Co.*, 234 N.J.Super. 234, 245, 560 A.2d 739 (Ch.Div.1989); *State v Exxon Corp.*, 151 N.J.Super. 464, 471, 376 A.2d 1339 (Ch.Div.1977). "For example, the verb 'leak' is defined as follows: 'to enter or escape through a hole, crevice or other opening usually by a fault or mistake.'" *Exxon Corp.*, 151 N.J.Super. at 471, 376 A.2d 1339. "Similarly, 'spilling' is defined as 'to cause or allow accidentally or unintentionally to fall, flow or run out so as to be lost or wasted.'" *J.T. Baker Co.*, 234 N.J.Super. at 245, 560 A.2d 739. "These verbs connote some activity, some human agency, *even if that activity is accidental or unintentional.*" *Exxon Corp.*, 151 N.J.Super. at 471, 376 A.2d 1339 (emphasis added); *accord J.T. Baker Co.*, 234 N.J.Super. at 245, 560 A.2d 739.

■ Hence, the plain language of the Pollution Control Act indicates that the statute was designed to cover all discharges of pollutants into the state's waters, regardless of whether the discharge resulted from an intentional or unintentional act. In other words, the Pollution Control Act is properly regarded as a "strict liability" statute. Again, there is New Jersey caselaw comporting with this interpretation. In *State v. Lew-is*, 215 N.J.Super. 564, 572–73, 522 A.2d 485 (App.Div.1987), the court construed the civil penalty provisions of the Pollution Control Act and another New Jersey environmental statute as follows:

The cited statutes giving rise to imposition of civil penalties and remedies neither refer to nor require a finding of intent to violate the act before their remedies may be invoked. In that regard they are clearly akin to "strict liability" statutes, *see State v. Harris*, 214 N.J.Super. 140, 148 [518 A.2d 743] (App.Div.1986), the violation of which can result in civil penal sanctions regardless of moral culpability or the need for a finding of mens rea such as is often the case under the criminal law. The penalty section of the Solid Waste Management Act, *N.J.S.A.* 13:1E–9f, provides that any person who violates the Act or its accompanying regulations "shall be liable to a penalty of not more than $25,000 per day" to be collected in an action in the Superior Court. Similarly, the penalty section of the Water Pollution Control Act, *N.J.S.A.* 58:10A–10e, states that violators "shall be subject upon order of a court to a civil penalty not to exceed $10,000 per day of such violation...." Only the doing of the proscribed act need be shown.

(Citations and footnotes omitted)

■ Thus, in order for New Jersey to prevail on its claim against Limitation Plaintiff for civil penalties under the Pollution Control Act, New Jersey simply must show that the PRESIDENTE RIVERA "leak[ed]" or "spill[ed]" oil into the Delaware River. Since any such "discharge" of pollutant (oil) was not and could not be authorized by a valid NJPDES permit, it would constitute a violation of the Act.

There is additional support in the Pollution Control Act indicating that the statute was intended to cover uncontrolled discharges of pollutants from an ocean vessel, including an oil tanker. Specifically, section 58:10A–6d(2) of the Act provides as follows:

The commissioner may, by regulation, exempt the following categories of discharge, in whole or in part, from the requirement of obtaining a permit under this

act; provided, however, that an exemption afforded under this section shall not limit the civil or criminal liability of any discharger nor exempt any discharger from approval or permit requirements under any other provision of law:

\* \* \*

(2) Discharges of any pollutant from a marine vessel or other discharges *incidental to the normal operation of marine vessels.*

N.J.S.A. 58:10A–6d(2) (emphasis supplied).

This section of the Pollution Control Act indicates that the New Jersey legislature intended the Act to apply to pollution discharges from marine vessels—except when said discharges result from or are "incidental to the normal operations of marine vessels", which discharges may be exempted from the Act's coverage by regulations promulgated by the appropriate regulatory authority. Obviously, the PRESIDENTE RIVERA's spillage of over 183,184 gallons oil into the Delaware River cannot be considered a discharge "incidental to the normal operations of marine vessels", and therefore could not be exempted from the Act's reach.

As to the meaning of the term "incidental" discharge, New Jersey cites the following language from regulations promulgated pursuant to section 58:10A–6d(2):

> The following discharges do not require DSW [discharge to surface water] permits: 1. *Any discharge of* sewage from vessels, *effluent from properly functioning marine engines,* laundry, shower, and galley sink wastes, or any other discharge incidental to the normal operation of a vessel.

N.J.A.C. 7:14A–3.1(b) (emphasis supplied).

This regulation indicates that oil or other "effluent" discharged by an "[im]properly functioning marine engine" can subject the marine vessel's owner/operator to liability under the Act. Significantly, neither the regulations nor the Act itself requires said marine vessel owner/operator to have knowledge of the fact that his marine engine is not "properly functioning" and is discharging "effluent" as a result thereof in order to hold him liable under the Act.

Limitation Plaintiff argues that (1) the New Jersey legislature did not intend for the Pollution Control Act to impose liability when the pollution discharge at issue resulted from an irregular, accidental event—such as an accidental oil spill from an oil tanker; and (2) the New Jersey Spill Compensation and Control Act ("the Spill Act"), N.J.STAT.ANN. § 58:10–23.11 to 58:10–23.24 (West 1992), which clearly applies to accidental discharges of large quantities of oil from an ocean tanker, is the exclusive statutory authority governing marine oil spills.

The Court rejects these contentions. If the New Jersey legislature intended to exempt accidental discharges of oil into the water from oil tankers, then it could have drafted the Act so as to achieve such a result. Indeed, as discussed above, the legislature in fact drafted the Act so as to exempt certain types of marine vessel discharges from the Act's coverage. Accidental discharges of large quantities of oil from an oil tanker were not included in those exemptions.

As to Limitation Plaintiff's argument as to whether the New Jersey legislature intended to hold oil tanker owner/operators responsible for accidental discharges of oil both under the Pollution Control Act and under the Spill Act, it appears that the legislature understood that there are instances where both acts would impose liability on such a party and that the legislature specifically enacted an "anti-stacking" provision to address such situations.

Indeed, the Court already addressed the relevance and application of this anti-stacking provision in its prior Memorandum Opinion discussing New Jersey's motion for partial summary judgement. The Court opined as follows with respect to this issue:

> Limitation plaintiff posits that if penalties are imposed against it under the New Jersey Spill Compensation and Control Act, then New Jersey is precluded from seeking penalties pursuant to any other statutory authority. The relevant provision of the Spill Act provides in pertinent part that "no person who receives compensation for damages or cleanup costs pursuant to any other State or Federal law shall be permitted to receive compensation for the same damages or cleanup costs under this act." N.J.S.A. 58:10–23.11v. The dif-

ficulty with limitation plaintiff's position is that New Jersey seeks *compensation for damages and cleanup costs* under only the Spill Act. Although New Jersey seeks *statutory penalties* under other environmental statutes, the anti-stacking provision limits only compensation for damages and cleanup costs and does not address statutory penalties. Limitation plaintiff's argument, therefore, must fail.

*In re Oriental Republic of Uruguay,* 806 F.Supp. 42, 46 (D.Del.1992).[1]

The Spill Act's anti-stacking provision indicates that the New Jersey legislature appreciated that the Spill Act may impose liability in cases where liability also could be imposed under another state environmental law, including the Pollution Control Act, and that the legislature addressed this circumstance by limiting the State and others to *compensatory* recovery under only one statute. As to civil penalties, however, it appears that the legislature intended to allow multiple recoveries for such penalties under different statutes. Accordingly, the Court concludes that New Jersey is entitled to recover civil penalties both under the Spill Act and under the Pollution Control Act.

### III. Conclusion

For the foregoing reasons, the Court finds that Limitation Plaintiff is liable for statutory penalties under the Water Pollution Control Act since the PRESIDENTE RIVERA "spilled" oil into the waters of New Jersey in violation of the Act. Therefore, the Court will reaffirm its prior decision finding that New Jersey is entitled to partial summary judgment on the issue of Limitation Plaintiff's liability for civil penalties under the Water Pollution Control Act.

---

1. Limitation Plaintiff moved for reconsideration of this issue, but presented no persuasive authority in support of its position that the Spill Act's anti-stacking provision applies so as to preclude New Jersey from seeking civil penalties under both the Spill Act and the Pollution Control Act. The Spill Act's anti-stacking provision applies only so as to prevent New Jersey from seeking *compensation* under both acts. The anti-stacking provision says nothing about civil penalties. If the New Jersey legislature intended to preclude the State from seeking civil penalties both under the Spill Act and under the Pollution Control Act, it could have drafted the Spill Act's anti-stacking provision in order to achieve such a result. It did not. Therefore, the Court reaffirms its prior conclusion that New Jersey may seek and recover civil penalties under both acts.