54 A.3d 830

NEW JERSEY SCHOOLS DEVELOPMENT AUTHORITY, PLAINTIFF–APPELLANT, v. JOSEPH MARCANTUONE AND ROBERT GIESON, DEFENDANTS–RESPONDENTS, AND JRM, LLC (D/B/A CARRIAGE TRADE CLEANERS), AND SANG HAK SHIN (A/K/A JOSEPH SHINN), DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued December 7, 2011—Decided October 29, 2012.

Before Judges FUENTES, HARRIS, and KOBLITZ.

*A. Paul Stofa*, Deputy Attorney General, argued the cause for appellant (*Paula T. Dow*, Attorney General, attorney; *Melissa H. Raksa*, Assistant Attorney General, of counsel; *Mr. Stofa*, on the brief).

*Mara Epstein*, argued the cause for respondents (*Lieberman & Blecher, P.C.*, attorneys; *Ms. Epstein*, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In 2005, the City of East Orange (the City) acquired by condemnation real property owned by defendants Joseph Marcantuone and Robert Gieson. Plaintiff New Jersey Schools Development Authority provided the funding for this acquisition. The court entered final judgment in the condemnation action in 2007, awarding defendants $629,407 as just compensation. From this sum, the court set aside $182,035.20, representing the estimated cost of environmental cleanup of the land. The court ordered that these funds be held in trust by the Clerk of the Superior Court until the final cost of remediation was ascertained and a determination on liability established.

In 2008, plaintiff filed suit in the Law Division against defendants to recover approximately $212,000 spent to remediate the site. Relying on our decision in *White Oak Funding, Inc. v. Winning*, 341 *N.J.Super.* 294, 775 *A.2d* 222 (App.Div.), *certif. denied*, 170 *N.J.* 209, 785 *A.2d* 437 (2001), the trial court granted defendants' motion for summary judgment and dismissed plaintiff's complaint. The trial court held that defendants were not liable because they purchased the property before September 14, 1993,[1] and were not "in any way responsible" for the contamination under *N.J.S.A.* 58:10–23.11g(c)(1) of the New Jersey Spill Compensation and Control Act (the Spill Act), *N.J.S.A.* 58:10–23.11 to –23.24.

On appeal, plaintiff argues that the trial court erred by failing to recognize that our decision in *White Oak* was in part implicitly superseded by the 2001 amendments to the Spill Act[2] creating the "innocent purchaser" defense codified at *N.J.S.A.* 58:10–23.11g(d)(5). According to plaintiff, the only way an owner who purchased contaminated land before September 14, 1993, can avoid liability under the Spill Act is to establish, by a preponderance of the evidence, the four elements of the "innocent purchaser" defense.

We agree with plaintiff's position and reverse. Although it may seem counterintuitive to infer liability from legislation establishing an affirmative defense, logic dictates that that is the case. The "innocent purchaser" defense in *N.J.S.A.* 58:10–23.11g(d)(5), applicable to those who acquired contaminated land *before* September 14, 1993, read *in pari materia* with *N.J.S.A.* 58:10–23.11g(d)(2), which provides a similar defense to those who acquired contaminated land *after* September 14, 1993, reveals the Legislature's

---

[1] September 14, 1993, is the date the New Jersey Industrial Site Recovery Act (ISRA), *N.J.S.A.* 13:1K–6 to –14, became effective.

[2] *White Oak* was decided on July 6, 2001. The 2001 amendments to the Spill Act were adopted by the Legislature a few weeks before and became effective on July 13, 2001.

acknowledgment of the underlying liability these affirmative defenses were intended to counteract.

We thus reverse the trial court's decision dismissing plaintiff's complaint and remand the matter for the purpose of permitting defendant to develop and present evidence addressing the elements of the "innocent purchaser" defense established under *N.J.S.A.* 58:10–23.11g(d)(5). Because we reverse the trial court's grant of summary judgment on these grounds, we do not address plaintiff's argument based on the doctrine of unjust enrichment.

I

In June 1985, defendants purchased property located at 25–33 North Arlington Avenue in East Orange` (the property). At the time of purchase, the property was partly occupied and leased to Carriage Trade Cleaners, a dry cleaning establishment. A number of dry cleaners have continuously operated on this site since 1930.[3] Defendants owned and operated a grocery store on another section of the property. They have never personally owned or operated a dry cleaning establishment on the property.

In June 2003, Empire Environmental (Empire) conducted an environmental investigation of the property known as a Phase I Environmental Assessment. This consisted of "an on-site investigation, review of related current and historical environmental records and an examination of adjacent and surrounding properties." This investigation "discovered a number of areas of environmental concern [and] one possible incident of environmental non-compliance but no history of environmental non-compliance with regulatory agencies." The report also noted that "there appears to be an abandoned, unregistered, underground storage

---

[3] JRM, LLC, and Sang Hak Shin were defendants' tenants and the last operators of the dry cleaning establishment that utilized the hazardous substance tetrachloroethylene or perchloroethylene (PCE) during the time defendants owned the property. The trial court dismissed the claims against these tenants because plaintiff was not able to prove that they discharged any hazardous substances. Plaintiff did not appeal the trial court's decision.

tank in the rear parking lot of the site ... [with] some indication of the use and storage of hazardous materials in consumer and industrial quantities."

Empire recommended that action be taken to determine the age, condition, and contents of the tank and, "if necessary," that the tank be properly removed and abandoned "in accordance with state and local regulations." There was "no evidence of improper disposal of hazardous materials on site," and "no signs of the occurrence of negative environmental impact to the site from the surrounding area."

Empire found that the dry cleaners on site used "industrial quantities of solvents and cleaners," but noted that "[t]he unit in the dry cleaners is a closed system designed to contain all of the cleaning fluids with no emissions to air or liquid discharges." The report concluded that, "[b]ased on [Empire's] field observations, interviews and reviews of available data, the subject site does not appear to be negatively impacted due to past uses or current practices and operations." Although the property did not need "major environmental corrective action," Empire recommended that a limited investigation be conducted.

II

On November 4, 2005, the City filed a condemnation action against defendants seeking to acquire the property for the purpose of constructing the "East Orange School District Abbott School Demonstration Project Pre–K–12 School for the Performing Arts." The City offered defendants $365,000 in compensation, minus an estimated cleanup and remediation cost of $17,489. On December 15, 2005, the City filed a declaration of taking and deposited the estimated compensation amount with the court pursuant to *N.J.S.A.* 20:3–18.[4]

---

[4] *N.J.S.A.* 20:3–18 provides, in relevant part, that "[s]imultaneously with the filing of the declaration of taking, the condemnor shall deposit the amount of such estimated compensation with the clerk of the court."

In 2004, prior to this condemnation action, the New Jersey School Construction Corporation retained PMK Group, Inc. (PMK), to conduct an environmental site investigation of the property. Although a complete copy of the preliminary assessment and site investigation report (PA/SIR) from this investigation is not included as part of the appellate record, according to a summary of the report provided by defendants' expert, "[b]ased on [PMK's] findings, no investigation with respect to the (former) dry cleaning operations ... was originally recommended or proposed by PMK." Plaintiff does not dispute this contention.

On plaintiff's behest, PMK prepared a Property Acquisition Environmental Cost Estimate Report (PAECER) in April 2005, in which it noted that "[PCE] [wa]s used for dry cleaning operations on the property"; it nevertheless concluded that "[n]o further investigation of interior storage areas, or the area surrounding the drums and dry cleaning machinery, [wa]s warranted at [that] time."

PMK prepared a second PA/SIR in March 2006, following the filing of the declaration of taking. Once again, a copy of this report is not included in the record before us. Defendants' expert asserted, however, that "[w]hereas no further action was recommended for the Carriage Trade Cleaners ... in the April 2005 PAECER, the March 2006 PA/SIR recommended investigation of the subsurface materials below the slab floor of the [dry cleaners'] building in the storage and handling areas." This characterization of the March 2006 PA/SIR is not contested by plaintiff.

On March 31, 2006, PMK collected soil samplings from beneath the concrete slab of the portion of the property previously occupied by the dry cleaning establishment. Analysis of these samplings indicated the presence of PCE levels that, according to defendants' expert, were "above the most stringent New Jersey Department of Environmental Protection (NJDEP) soil cleanup criteria in effect at the time." Additional soil samplings were taken on May 4, 2006, and January 16, 2007. These samplings also showed PCE contamination on the property. Soil remedia-

tion on the dry cleaning property began in October 2006 and concluded in December 2006.

On November 27, 2007, the trial court entered final judgment in the condemnation action, ordering the City to pay defendants $629,407 as just compensation, minus $365,000 previously deposited into Court and withdrawn by defendants. The court further ordered that

[f]rom the total balance due and owing ... the sum of $182,035.20 [5] shall be paid by plaintiff to the Clerk of the Superior Court of New Jersey, Trust Fund Unit, and shall remain on deposit until further Order of the Court as an Environmental Trust–Escrow Account as is prescribed by *Housing Authority of New Brunswick v. Suydam Investors,* 177 *N.J.* 2 [826 *A.2d* 673] (2003).

### III

On February 1, 2008, plaintiff filed this action against defendants to recover the $182,345.20 [6] in cleanup and remediation costs under the Spill Act and the equitable doctrine of unjust enrichment. As part of their defense, defendants retained Blaine A. Fresco of Environmental Strategies and Applications, Inc., who prepared a report entitled "Review of Documents Related to Condemnation Proceedings of Property Identified as Block 373, Lot 7." In this report, Fresco reviewed and chronicled the environmental investigations that were conducted on the property over its history. As to the discharge of PCE on the property (the only contamination relevant to this appeal), Fresco made the following findings in a section of the report entitled "Standard Due Diligence Investigation Procedures":

---

5 The court derived this figure from a certification submitted by David Christiansen, a representative of the redevelopment firm. According to Christiansen, it cost $182,035.20 to complete the investigation and remediation of the environmental contamination at the property including "the taking of borings and testing samples" and "excavation and disposal of PCE impacted soils associated with the former dry cleaner operation on the site."

6 Plaintiff now asserts that the cost of remediation has risen to "approximately $212,000."

Currently, completion of a pre-purchase due diligence investigation is standard procedure in property transactions involving non-resident properties, and to a lesser extent even some residential properties. The due diligence investigation is commonly referred to as a Phase I and Phase II study or investigation or, in New Jersey, a [PA] and site investigation. However, as discussed below, this was not always the case.

A review of literature indicates that studies resembling current environmental site assessments, or Phase I's as they are commonly referred to, began in the 1970's by purchasers looking to assess risks of ownership of commercial properties which had a high degree of risk from prior toxic chemical use or disposal, although this was mostly utilized by large and multi-national corporations. Subsequently, Love Canal in 1978 and the passage of the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) increased awareness, however throughout the early and mid–1980's the practice of environmental due diligence was still generally limited to large corporations with business in Europe.

Specific to New Jersey, the passing of [Environmental Clean-up Responsibility Act (ECRA)] in 1983 required preparation and submittal of a Site Evaluation Submission (SES) as part of the ECRA requirements. The SES presented the NJDEP's requirements, in effect at that time, for evaluation of environmental conditions at a property. However ECRA did not apply to all property transactions, but only for those facilities which were considered an "industrial establishment" as defined in ECRA. For example, dry cleaners were not considered an "industrial establishment" under ECRA and therefore ECRA did not apply to, and completion of a SES was not required for, a sale of property on which a dry cleaner was located. Additionally, based on my experience in New Jersey, around this time most banks did not require completion of a Phase I Environmental Site Assessment, only a determination regarding the applicability of ECRA to a property sale. If a property sale was not subject to ECRA then all a bank typically required was submittal of an ECRA letter of non-applicability (LNA), basically a letter from NJDEP indicating that ECRA was not applicable to the transaction. However, based on my experience, this began to change in the late 1980's and early 1990's, as banks generally became more environmentally aware.

[ (Footnotes omitted).]

Plaintiff moved for partial summary judgment, "seeking a ruling that [defendants] are liable, as a matter of law, under the Spill Act." Defendants responded and cross-moved for summary judgment, seeking a judicial declaration that they were not liable as a matter of law under the Spill Act because they did not discharge the hazardous materials and were not "otherwise responsible" for the discharge. Following oral argument, the trial court denied plaintiff's motion and granted defendants' cross-motion for summary judgment. The motion judge did not find any evidence in

the record indicating that hazardous materials were discharged during defendants' period of ownership of the property.

## IV

### A

In reviewing an order granting summary judgment, we employ the same standard used by the trial court. *Prudential Prop. & Casualty Ins. Co. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.1998). Stated differently, we "apply a *de novo* standard of review when evaluating whether summary judgment was proper." *Simonetti v. Selective Ins. Co.,* 372 *N.J.Super.* 421, 427, 859 *A.*2d 694 (App.Div.2004). That standard is well-settled. Summary judgment should be granted only if the record demonstrates that there is "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2; *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

### B

When the Legislature adopted the Spill Act in 1976, it intended
to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharges.

[*N.J.S.A.* 58:10-23.11a.]

In 1993, the Legislature amended the then-existing ECRA and re-named it as the ISRA. *N.J.S.A.* 13:1K–6 to –14. Concurrent with the adoption of the ISRA, the Legislature included the following amendment to the Spill Act, denoted the "innocent purchaser" defense:
(2) A person, including an owner or operator of a major facility, who owns real property acquired on or after September 14, 1993 on which there has been a discharge, shall not be liable for cleanup and removal costs or for any other damages to the State or to any other person for the discharged hazardous

substance pursuant to subsection c. of this section or pursuant to civil common law, if that person can establish by a preponderance of the evidence that subparagraphs (a) through (d) apply . . .:

(a) the person acquired the real property after the discharge of that hazardous substance at the real property;

(b) (i) at the time the person acquired the real property, the person did not know and had no reason to know that any hazardous substance had been discharged at the real property . . .;

(c) the person did not discharge the hazardous substance, is not in any way responsible for the hazardous substance, and is not a corporate successor to the discharger or to any person in any way responsible for the hazardous substance or to anyone liable for cleanup and removal costs pursuant to this section;

(d) the person gave notice of the discharge to the department upon actual discovery of that discharge.

To establish that a person had no reason to know that any hazardous substance had been discharged for the purposes of this paragraph (2), the person must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property. For the purposes of this paragraph (2), all appropriate inquiry shall mean the performance of a preliminary assessment, and site investigation, if the [PA] indicates that a site investigation is necessary . . ., and performed in accordance with rules and regulations promulgated by the department defining these terms.

Nothing in this paragraph (2) shall be construed to alter liability of any person who acquired real property prior to September 14, 1993.

[*N.J.S.A.* 58:10–23.11g(d)(2).]

The 1993 amendments to the Spill Act also included a provision conferring immunity on a public entity that acquires property through condemnation or eminent domain on which a discharge or contamination has occurred through no fault of the public entity:

Any federal, State, or local government entity which acquires ownership of real property through bankruptcy, tax delinquency, abandonment, escheat, eminent domain, condemnation or any circumstance in which the governmental entity involuntarily acquires title by virtue of its function as sovereign, or where the governmental entity acquires the property by any means for the purpose of promoting the redevelopment of that property, shall not be liable, pursuant to subsection c. of this section or pursuant to common law, to the State or to any other person for any discharge which occurred or began prior to that ownership. This paragraph shall not provide any liability protection to any federal, State or local governmental entity which has caused or contributed to the discharge of a hazardous substance. This paragraph shall not provide any liability protection to any federal, State, or local government entity that acquires ownership of real property by condemnation or eminent domain where the real property is being remediated in a timely manner at the time of the condemnation or eminent domain action.

[*N.J.S.A.* 58:10–23.11g(d)(4).]

The following Spill Act provision was subsequently added by amendment in 1997 (effective January 6, 1998):

> In addition to persons liable pursuant to this subsection, any person who owns real property acquired on or after September 14, 1993 on which there has been a discharge prior to the person's acquisition of that property and who knew or should have known that a hazardous substance had been discharged at the real property, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.... Nothing in this paragraph shall be construed to alter liability of any person who acquired real property prior to September 14, 1993.

[*N.J.S.A.* 58:10–23.11g(c)(3).]

The Legislature further amended the Spill Act in 2001 to include the following provision, which included language largely paralleling the provisions in *N.J.S.A.* 58:10–23.11g(d)(2), except for the emphasized, relevant distinctions:

> A person, including an owner or operator of a major facility, who owns real property acquired *prior to* September 14, 1993 on which there has been a discharge, shall not be liable for cleanup and removal costs or for any other damages to the State or to any other person for the discharged hazardous substance pursuant to subsection c. of this section or pursuant to civil common law, if that person can establish by a preponderance of the evidence that subparagraphs (a) through (d) apply:
>
> . . . .
>
> To establish that a person had no reason to know that any hazardous substance had been discharged for the purposes of this paragraph (5), the person must have undertaken, at the time of acquisition, all appropriate inquiry on the previous ownership and uses of the property *based upon generally accepted good and customary standards.*
>
> Nothing in this paragraph (5) shall be construed to alter liability of any person who acquired real property *on or after* September 14, 1993.

[*N.J.S.A.* 58:10–23.11g(d)(5) (emphasis added).]

Plaintiff argues that, in light of these legislative initiatives, the trial court erred when it failed to hold defendants liable under the Spill Act as a matter of law. Focusing on the 2001 amendment, plaintiff asserts that the defense codified at *N.J.S.A.* 58:10–23.11g(d)(5) presupposes the existence of liability for owners of contaminated property who fail to conduct environmental due diligence prior to acquiring title. According to plaintiff, defendants' failure to perform any environmental investigation prior to

purchasing the property in 1985 renders them liable for the cost of remediation. In plaintiff's view, the trial court erred in two respects: (1) by concluding that liability can only attach to "current owners" of contaminated property; and (2) by finding that defendants were not the current owners of the property despite their continued ownership until condemnation.

Defendants argue that, in adopting *N.J.S.A.* 58:10–23.11g(d)(5), the Legislature did not expressly state that owners of contaminated sites who acquired title before 1993 were now considered within the class of those "in any way responsible for pre-purchase discharges." According to defendants, if the Legislature wanted to expand the class of those liable under the Spill Act, it would have done so in a straightforward manner as it did when it adopted the ISRA in 1993.

C

■   *N.J.S.A.* 58:10–23.11g(c)(1) imposes strict liability on "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance." "Discharge" is explicitly defined by the Act as any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State.

[*N.J.S.A.* 58:10–23.11b.]

■   Defendants were not "dischargers" of any toxic substance. All contamination occurred prior to defendants' acquisition of the property in 1985. Thus, defendants' liability, if any, can only be found if they are "in any way responsible" for the hazardous substances found on the property, or by virtue of their lack of due diligence in discovering the contamination at the time they purchased the land. The phrase "in any way responsible" was recently interpreted by our Supreme Court to require "some

connection between the discharge complained of and the alleged discharger." *N.J. Dep't of Envtl. Prot. v. Dimant,* 212 *N.J.* 153, 177, 51 *A.*3d 816 (2012). The phrase must be broadly construed to encompass either ownership or control over the property at the time of the damaging discharge, or control over the hazardous substance that caused the contamination. *Id.* at 177–78, 51 *A.*3d 816.

Here, the trial court relied on our decision in *White Oak* when interpreting the phrase "in any way responsible." The principal question before us in *White Oak* was whether the defendants were liable as "dischargers" under the Spill Act by virtue of "the migration of hazardous substances already present in the soil," despite the fact that the defendants did not own the property at the time the substances first entered the soil. 341 *N.J.Super.* at 298–99, 775 *A.*2d 222. We were also asked to determine whether the defendants were subject to liability under the Spill Act as parties "in any way responsible" for contamination of a parcel of real property by virtue of being "aware of the prior use of the [contaminated] property as a fuel oil distribution business with an above-ground tank" and having "conducted no environmental due diligence prior to purchase." *Id.* at 300–01, 775 A.2d 222.

In response to the first question, we concluded that the defendants could not be liable as dischargers under the Spill Act's definition of "discharge" based only on the "passive migration" of contaminants, such as the continued seepage and movement of hazardous substances through soil. *Id.* at 298–99, 775 *A.*2d 222. We emphasized that "[i]mposition of Spill Act liability as a discharger requires some act or omission of human conduct which causes a hazardous material not previously present to enter the waters or land." *Id.* at 299, 775 *A.*2d 222.

On the question of liability under the category of "in any way responsible," we noted:

Plaintiff further contends the [defendants] are liable as persons "in any way responsible" for the contamination. This is so, according to plaintiff, because the [defendants] were aware of the prior use of the property as a fuel oil distribution business with an above-ground tank, they conducted no environmental due dili-

gence prior to purchase, they used the property commercially and sold it for a profit, and during their ownership the preexisting contamination migrated and spread. These circumstances ... are devoid of the critical factor which triggers liability under this provision [of the Spill Act]: the person must be in any way responsible for the *discharge* that caused the contamination.

In [*State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 *N.J.* 473, 502, 468 *A.*2d 150 (1983)], our Supreme Court interpreted the phrase "in any way responsible," and stated that while subsequent acquisition of land on which hazardous substances have been previously dumped may be insufficient to hold the owner responsible, "[o]wnership or control over the property at the time of the discharge, however, will suffice." The [defendants] had neither ownership nor control over the property when the discharge of fuel oil onto the land occurred, during [another party's] ownership. Our Supreme Court has applied this same principle in [*Marsh v. N.J. Dep't of Envtl. Prot.*, 152 *N.J.* 137, 703 *A.*2d 927 (1997)], where it held that Marsh was a responsible person not because of any lack of due diligence on her part and not because she actively discharged any pollutants, "but because the underground gasoline tanks leaked during Marsh's ownership of the property." *Id.* at 146 [703 *A.*2d 927].

In this pre-ISRA situation, neither lack of due diligence under the circumstances of this case nor the other circumstances advanced by plaintiff bring [the defendants] within the ambit of the Spill Act's "in any way responsible" provision. In these circumstances, passive migration of pre-existing contamination does not result in Spill Act liability.

[*White Oak, supra,* 341 *N.J.Super.* at 300–02, 775 *A.*2d 222 (footnote omitted).]

As post-contamination purchasers, defendants maintain that they cannot be held liable as being "in any way responsible," regardless of any asserted lack of due diligence in inspecting the property for environmental contamination prior to purchase. Plaintiff argues that part of our holding in *White Oak* was superseded by *N.J.S.A.* 58:10–23.11g(d)(5), which the Legislature adopted several weeks before the release of our decision in that case and became effective one week after our decision. We are persuaded by plaintiff's argument.

Under *N.J.S.A.* 58:10–23.11g(d)(5), defendants must prove that, at the time they acquired the property in 1985, they did not know or have reason to know that hazardous substances had been discharged on the property. To meet this defense, defendants must prove that they undertook, "at the time of acquisition, all appropriate inquiry on the previous ownership and uses of the property *based upon generally accepted good and customary standards.*" *N.J.S.A.* 58:10–23.11g(d)(5) (emphasis added). Thus, the trial court must first determine what the generally accepted

good and customary standards were at the time defendants acquired title to the property. Defendants can then present evidence as to what pre-purchase efforts and investigation they undertook. Liability will depend upon whether defendants satisfied the prevailing standard as found by the court.

## D

■ Having determined that liability may exist for an owner who purchased previously contaminated land and failed to conduct due diligence prior to purchase, we must next determine whether such liability may attach to defendants under the facts of this case. Plaintiff argues that the trial court erred in finding that "the operative period of ownership for Spill Act liability was not at the time of [defendants'] purchase [of the property], nor at the time of condemnation, but at the present time, finding [that plaintiff] is the current owner." Defendants counter by asserting that, "[p]ursuant to *N.J.S.A.* 20:3–19, in eminent domain proceedings, ownership vests upon the filing of the Declaration of Taking and depositing the amount of just compensation with the court." Because the Declaration of Taking here was filed on December 15, 2005, and the contamination on the property was not fully discovered by plaintiff and reported to defendants until 2006, defendants argue that they "were not the owners when the contamination was discovered."

■ We reject defendants' argument. The approach adopted by the trial court under these circumstances runs contrary to the intent of the Supreme Court's holding in *Suydam*, in which the Court directed the condemning authority to pay fair compensation as though the property had been remediated and then place in escrow the estimated cost of remediation until the true cost of remediation is determined in a subsequent proceeding. *Suydam, supra*, 177 *N.J.* at 25, 826 *A.*2d 673. Once the owner's liability for the discharge is determined, a corresponding percentage of the cost of remediation is disbursed from the trust or escrow account to the condemnor; the balance, if any, is then disbursed to the property owner. *Ibid.*

The Suydam Court concluded that such a mechanism was the appropriate way to value potentially contaminated condemnation sites for several reasons relevant to the present matter. First, it concluded that "[s]uch a proceeding allows for *third-party claims* against insurers, title companies, and *prior owners,* none of whom have a place at the condemnation table." *Id.* at 24, 826 *A.*2d 673 (emphasis added). Second, the Court noted that "the cost-recovery proceeding makes available to the condemnee Spill Act defenses (for example, war, sabotage, Act of God, or a combination thereof, and *non-responsibility in-fact*) that are not relevant to an Eminent Domain proceeding." *Ibid.* (emphasis added).

Based on the principles articulated by the Court in *Suydam,* and notwithstanding the provisions in *N.J.S.A.* 20:3–19 vesting title to the condemnor at the time of the filing of the declaration of taking, for purposes of Spill Act liability, we consider condemnees to be the "current owners" of property. Defendants here may face liability for remediation costs unless they can establish the elements in the *N.J.S.A.* 58:10–23.11g(d)(5) defense.

Reversed and remanded for further proceedings in accordance with this opinion.